```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                         MARSHALL DIVISION

 3   MOBILE TELECOMMUNICATIONS      )(
     TECHNOLOGIES, LLC              )(      CIVIL DOCKET NO.
 4                                  )(      2:13-CV-948-JRG-RSP
     VS.                            )(      MARSHALL, TEXAS
 5                                  )(
     HTC AMERICA, INC.              )(      SEPTEMBER 19, 2016
 6                                  )(      1:23 P.M.

 7

 8                 TRIAL TRANSCRIPT OF JURY TRIAL

 9        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

10              UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   FOR THE PLAINTIFF:   Mr. Daniel R. Scardino
                          Mr. Raymond W. Mort, III
14                        Mr. Ian E. Cohen
                          Mr. Dustin L. Taylor
15                        Mr. Steven P. Tepera
                          REED & SCARDINO LLP
16                        301 Congress Avenue, Suite 1250
                          Austin, Texas 78701
17
                          Mr. Deron R. Dacus
18                        THE DACUS FIRM, P.C.
                          821 ESE Loop 323, Suite 430
19                        Tyler, Texas 75701

20   COURT REPORTER:      Ms. Shelly Holmes, CSR-TCRR
                          Official Reporter
21                        United States District Court
                          Eastern District of Texas
22                        Marshall Division
                          100 E. Houston Street
23                        Marshall, Texas  75670
                          (903) 923-7464
24
     (Proceedings recorded by mechanical stenography, transcript
25   produced on a CAT system.)
```

```
1    FOR THE DEFENDANT:    Mr. Jerry R. Selinger
                           Mr. Trampas A. Kurth
2                          Ms. Susan E. Powley
                           PATTERSON & SHERIDAN, LLP
3                          1700 Pacific Avenue, Suite 2650
                           Dallas, Texas 75201
4
                           Mr. Harry L. Gillam
5                          GILLAM & SMITH LLP
                           303 South Washington Avenue
6                          Marshall, Texas 75670

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          (Jury out.)
 3          COURT SECURITY OFFICER:  All rise.
 4          THE COURT:  Be seated, please.
 5          Counsel, this morning in chambers, there was a
 6  discussion that -- between both sides there had been a mutual
 7  agreement reached with regard to adding an item to the list of
 8  pre-admitted exhibits.  If that's still the case, I need
 9  announcement in the record as to specifically what you are
10  proposing.
11          MR. SCARDINO:  Sure, Your Honor.  Daniel Scardino for
12  the Plaintiff.  This is Exhibit --
13          THE COURT:  Go -- go to the podium, please, Counsel.
14          MR. SCARDINO:  Of course.
15          The exhibit is PX-46 on the last admitted exhibit
16  list the Plaintiff filed with the Court.  It's an exhibit
17  called the SkyTel High-Level Description -- System Description,
18  I believe, and we conferred with opposing counsel, and there
19  was an agreement reached about using it today, as long as they
20  can use it for cross-examination.
21          THE COURT:  All right.  Is that Defendant's
22  agreement, Mr. Selinger?
23          MR. SELINGER:  Yes, it is, Your Honor.
24          THE COURT:  All right.  Though the time for
25  admission -- pre-admission of exhibits is long past, based on
```

1    the parties' mutual agreement, I will add PX-46 to the list of

2    pre-admitted exhibits.

3              MR. SCARDINO:  Thank you.

4              Your Honor, I apologize.  There -- apparently, there

5    is one more than we need to announce to the Court that is by

6    agreement.  It's PX-47, 47, that is the Samsung settlement

7    agreement, as I understand it.  And the parties have agreed

8    that both sides wanted to use that, so they've agreed to add

9    that to the exhibit list as well.

10             MR. GILLAM:  That's correct, Your Honor.

11             THE COURT:  So both PX-46 and PX-47 are newly added

12   pre-admitted exhibits by mutual agreement of both parties,

13   correct?

14             MR. GILLAM:  Yes, Your Honor.

15             MR. SCARDINO:  Yes, Your Honor.

16             THE COURT:  All right.  I'll ask the courtroom deputy

17   to make a note on the list of pre-admitted exhibits adding

18   PX-46 and 47.

19             All right.  Counsel, is there anything further before

20   I bring in the jury?

21             MR. DACUS:  Nothing from the Plaintiff, Your Honor.

22             MR. GILLAM:  Not from the Defense, Your Honor.

23             THE COURT:  All right.  If you'd bring in the jury,

24   please, Mr. Floyd.

25             COURT SECURITY OFFICER:  Yes, sir.

1          All rise for the jury.

2          (Jury in.)

3          THE COURT:  Welcome back from lunch, ladies and

4    gentlemen.  Please have a seat.

5          Thank you for being on time, ladies and gentlemen.  I

6    have some preliminary instructions that I want to give you

7    before we start with opening statements from the lawyers and

8    then get on to the evidence in the case.

9          You've now been sworn as jurors in this case.  And as

10   the jury, you are the sole judges of the facts.  As such, you

11   will decide and determine all of the facts in this case.

12         As the judge, I'll give you instructions on the law,

13   rule on questions of the law, procedure, and evidence, deal

14   with any issues regarding the decorum of the courtroom, and

15   I'll oversee the flow of the evidence during the trial itself.

16         At the end of the evidence, I'll give you detailed

17   instructions on the law to apply in deciding this case, and

18   I'll then give you a list of questions that you are then to

19   answer.  This list of questions is called the verdict form.

20   Your answers to those questions will need to be unanimous, and

21   those answers will constitute the jury's verdict in this case.

22         Now, I want to briefly tell you what this case is

23   about.  This case involves a dispute regarding a single certain

24   United States patent.  I know that you saw the patent video

25   this morning, but I want to give you some instructions on the

1   record about a patent and how one is obtained.

2          Patents are either granted or denied by the United

3   States Patent and Trademark Office.  You'll often hear this

4   agency of the government simply referred to as the PTO.

5          A valid United States patent gives the patentholder

6   the right for up to 20 years from the date the patent

7   application is filed to prevent others from making, using,

8   offering to sell, or selling the patented invention within the

9   United States or importing it into the United States without

10  the patentholder's permission.

11         A patent is a form of property called intellectual

12  property.  And like other forms of property, a patent can be

13  bought and it can be sold.

14         A violation of the patentholder's rights is called

15  infringement.  A patentholder may try to enforce a patent

16  against persons it believes to be infringers by filing a

17  lawsuit in federal court, and that's what we have in this case.

18         The process of obtaining a patent is called patent

19  prosecution.  To obtain a patent, one must first file an

20  application with the United States Patent and Trademark Office,

21  the PTO.  The PTO is an agency of the United States Government,

22  and it employs trained examiners who review patent

23  applications.

24         The application includes what is called a

25  specification.  The specification contains a written

1   description of the claimed invention telling what the invention

2   is, how it works, how to make it, and how to use it.

3          The specification concludes or ends with certain --

4   one or more certain numbered sentences.  These numbered

5   sentences are called the patent claims.  When a patent is

6   granted by the PTO, the claims define the boundaries of its

7   protection and give notice to the public of those boundaries.

8          Patent claims may exist in two forms referred to as

9   independent claims and dependent claims.

10          An independent claim does not refer to any other

11   claim in the patent.  It is independent.  Therefore, it's not

12   necessary to look at any other claim to determine what an

13   independent claim covers.

14          On the other hand, a dependent claim refers to at

15   least one other claim in the patent.  A dependent claim

16   includes each of the limitations in the other claim or claims

17   to which it refers or to which we sometimes say it depends, as

18   well as those additional limitations or elements recited within

19   the dependent claim itself.

20          Therefore, to determine what a dependent claim

21   covers, it's necessary to look at both the dependent claim

22   itself, as well as the independent claim or claims from which

23   it refers, or we sometimes say from which it depends.

24          The claim -- the claim of the -- the claims of the

25   patent-in-suit use the word "comprising."  Comprising means

1    including or containing.  A claim that includes the word

2    "comprising" is not limited to the methods or devices having

3    only the elements recited in the claim but also cover methods

4    or devices that add additional elements.

5            Take, for example, a claim that covers a table.  If

6    the claim recites a table comprising a tabletop, legs, and

7    glue, the claim will cover any table that contains these

8    structures, even if the table also contains other structures,

9    such as a leaf to go in the top of the table or wheels to go on

10   the ends of the legs.

11           Now, that's a simple example using the word

12   "comprising" and what it means.  In other words, it can have

13   other features in addition to those that are covered by the

14   patent.

15           Now, after the applicant files the application with

16   the PTO, an examiner is assigned, and that examiner reviews the

17   application to determine whether or not the claims are

18   patentable -- that is, whether or not the claims are

19   appropriate for patent protection and whether or not the

20   specification adequately describes the claimed invention.

21           In examining the patent application, the examiner

22   reviews certain information about the state of the technology

23   at the time the application is filed.

24           The PTO searches for and reviews this type of

25   information that is publicly available or that is -- or that

1    that is submitted by the applicant.  This type of information

2    is called prior art.  The examiner reviews this prior art to

3    determine whether or not the invention in the application is

4    truly an advance over the state of the art at the time.

5            Prior art is defined by law, and I'll give you

6    specific instructions at a later time as to what constitutes

7    prior art.  However, in general, prior art includes information

8    that demonstrates the state of the technology that existed

9    before the claimed invention was made or before the application

10   for a patent was filed.

11           A patent contains a list of certain prior art that

12   the examiner has considered.  The items on this list are

13   referred to as the cited references.

14           Now, after the prior art search and the examination

15   of the application, the examiner informs the applicant in

16   writing of what the examiner has found and whether the examiner

17   considers any claim to be patentable, in which case it would be

18   allowed.  This writing from the examiner is called an office

19   action.

20           Now, if the examiner rejects the claims, the

21   applicant has an opportunity to respond to the examiner to try

22   to persuade the examiner to allow the claims.  The applicant

23   also has a chance to amend or change the claims or add new

24   claims.

25           This process may go back and forth between the

1   examiner and the applicant for some time until the examiner is

2   satisfied that the application meets the requirements for a

3   patent.  And in that case, the application issues as a United

4   States patent, or in the alternative, if the examiner

5   ultimately concludes that the application should be rejected,

6   then no patent is issued.

7          Sometimes patents are issued after appeals within the

8   Patent and Trademark Office or to a court.  The papers granted

9   during these communications back and forth between the examiner

10  and the applicant are called the prosecution history.

11         The fact that the PTO grants a patent does not

12  necessarily mean that any invention claimed in the patent, in

13  fact, deserves the protection of a patent.  While an issued

14  United States patent is presumed to be valid under the law, a

15  person accused of infringement has the right to argue here in

16  federal court that the claimed invention in a patent is

17  invalid.

18         It's your job as the jury to consider the evidence

19  presented by the parties and to determine independently and for

20  yourselves whether or not the Defendant has proven that the

21  patent-in-suit is invalid.

22         To help you follow the evidence, I'll now give you a

23  brief summary of the positions of the parties.

24         As you know, the party who brings the lawsuit is

25  called the Plaintiff.  In this case, the Plaintiff is Mobile

1  Telecommunications Technologies LLC, who I will refer to
2  throughout the trial as either the Plaintiff or the short form
3  name, MTel.
4          A party against whom a lawsuit is brought is called
5  the Defendant.  In this case, the Defendant is HTC America,
6  Inc., who I'll refer to either as the Defendant or simply HTC.
7          As I told you during jury selection, this is a case
8  involving allegations of patent infringement.
9          There is one United States patent at issue in this
10 case; that is, United States Patent No. 5,754,946.  Patents are
11 commonly known by their last three digits, so with regard to
12 this patent in this case, you will hear it referred to
13 regularly as simply the '946 patent.  You may hear it called
14 the '946 patent.
15         The '946 patent is referred to as the patent-in-suit.
16 It may sometimes be called the asserted patent, and it
17 generally -- generally relates to cell phone features or to the
18 functionality of smartphones and tablets.
19         Now, you will have, ladies and gentlemen, a complete
20 copy of the '946 patent in your juror notebooks, which are
21 going to be passed out to you in just a few minutes.
22         The Plaintiff in this case, MTel, contends that the
23 Defendant in this case, HTC, directly, indirectly, and
24 willfully infringes certain claims of the patent-in-suit by
25 importing, making, and selling products that include their

1    patented technology.

2             MTel also contends that it is entitled to damages for

3    this alleged infringement.

4             The Defendant, HTC, denies that it's infringing the

5    patent-in-suit and contends that the asserted claims of the

6    patent-in-suit are invalid as either being anticipated by what

7    is called the prior art or as being obvious in light of the

8    prior art.

9             I'll give you more detailed instructions regarding

10   the meaning of these terms in a few minutes.

11            HTC also contends that MTel is not entitled to any

12   damages.

13            Now, I know, ladies and gentlemen, that there are a

14   lot of new words and concepts that are being thrown at you

15   today.  I'm going to define a lot of these words and concepts

16   for you as we go through these instructions.

17            The attorneys are going to discuss a lot of these in

18   their opening statements.  The witnesses are going to help you

19   with their testimony to understand these terms and concepts, so

20   please do not feel overwhelmed at this stage.  I promise you,

21   as we go through the trial, this will all come together.

22            Your job in this case is to decide whether the

23   asserted claims of the one patent-in-suit have been infringed

24   and whether the asserted claims of the patent-in-suit are

25   invalid.

```
1              If you decide that any claim of the patent-in-suit

2    has been infringed by HTC and is not invalid, you'll then need

3    to decide whether HTC's infringement has been willful and what

4    amount of money damages are to be awarded to MTel from HTC to

5    compensate for such infringement.

6              As I've told you, my job is to address questions

7    regarding the law, handle rulings on evidence and procedure,

8    and oversee the conduct of the trial.

9              In determining the law, it is specifically my job to

10   determine the meanings of any claim language from within the

11   asserted patent that needs interpretation.  I've already

12   determined the meaning of certain claim language in the

13   patent-in-suit, and you must accept the meanings that I give

14   you and use those meanings when you decide whether any

15   particular claim has or has not been infringed and whether or

16   not any claim is or is not invalid.

17             You'll be given a document in a few moments that

18   reflects these meanings that the Court is giving you.

19             For any claim term for which I have not provided you

20   with a definition, you should apply the plain and ordinary

21   meaning.

22             If you've been provided with a definition from the

23   Court, however, you are to apply my definition to those terms

24   throughout the case.

25             However, my interpretation of the language of the
```

claims should not be taken by you as an indication that I have

a personal opinion or any opinion at all regarding the issues

of infringement and invalidity.  Those, ladies and gentlemen,

are your issues to decide alone.

I'll provide you with more detailed instructions on

the meaning of the claims before you retire to deliberate and

reach your verdict.

In deciding the issues that are before you, though,

you'll be asked to consider specific legal rules, and I'll give

you an overview of those rules now.  And then at the conclusion

of the case, I'll give you much more detailed instructions.

The first issue that you'll be asked to decide is

whether --

(Cell phone ringing.)

THE COURT:  Mr. Floyd, I'm going to ask you to take

that cell phone from Mr. Gillam and take it outside the

courtroom, and I'll see whether he gets it back at a later date

or not.

COURT SECURITY OFFICER:  Yes, sir.

THE COURT:  It's the Court's rule that disruptions

like that are not permitted.

I told the ladies and gentlemen of the jury, they

cannot have their cell phones in the courtroom.  The lawyers

have electronic devices to help them with their handling of the

case, but they're under strict instructions not to let them

1    cause any disruptions and keep them on silent.

2              So because that disrupted the court, we're going to

3    confiscate that cell phone.  If you'll take that out and

4    return.

5              All right.  I'll continue with my preliminary

6    instructions to the jury.

7              The first issue you're going to be asked to decide is

8    whether HTC has infringed any of the asserted claims in the

9    patent-in-suit.

10             Infringement, ladies and gentlemen, is assessed on a

11   claim-by-claim basis, and MTel must show you by a preponderance

12   of the evidence that a claim has been infringed.  Therefore,

13   there may be infringement of one claim, but there may not be

14   infringement of any other claim.

15             There are also a few different ways that a patent can

16   be infringed.  I'll explain the requirement for those types of

17   infringement in detail at the conclusion of the case.  But in

18   general, HTC may infringe the asserted claims of the

19   patent-in-suit by making, using, selling, or offering for sale

20   in the United States or importing into the United States a

21   product meeting all the requirements of a claim from the

22   asserted patent.

23             I'll provide you with more detailed instructions on

24   infringement at the conclusion of the case.

25             Now, the second issue that you'll be asked to decide

1    is whether the asserted patent is invalid.  Invalidity is a

2    defense to infringement.

3            Therefore, even though the United States Patent and

4    Trademark Office has allowed the asserted claims and even

5    though a patent issued by the United States is presumed to be

6    valid, you, the jury, must decide whether those asserted claims

7    are invalid after hearing all the evidence presented in this

8    case.

9            You may find a patent claim to be invalid for a

10   number of reasons, including because the -- because it claims

11   subject matter that is not new or is obvious.

12           For a patent claim to be invalid because it is not

13   new, HTC must show by clear and convincing evidence that all

14   the elements of a claim are sufficiently described in a single

15   previous printed publication or patent.  We call these items

16   prior art.  If a claim is not new, it is said to be anticipated

17   by the prior art.

18           Another way that a claim can be found to be invalid

19   is that it may have been obvious.  Even though a claim is not

20   anticipated because every element of a claim is not shown or

21   sufficiently described in a single piece of prior art, the

22   claim may still be invalid if it would have been obvious to a

23   person of ordinary skill in the field of the technology of the

24   patent at the relevant time.

25           You'll need to consider a number of questions in

1   deciding whether the invention claimed in the asserted patent

2   is obvious.  I'll provide you with more detailed instructions

3   on these at the conclusion of the trial.

4           If you decide that any of claims of the

5   patent-in-suit have been infringed and are not invalid, that

6   is, the presumption of validity has survived, then you'll need

7   to decide whether HTC's infringement has been willful.

8           You will also need to decide what amount of money

9   damages are to be awarded to MTel to compensate it for that

10  infringement.

11          A damage award in a patent case must be adequate to

12  compensate the patentholder for the infringement, and in no

13  event may the damage award be less than what a patentholder

14  would have received had it been paid a reasonable royalty for

15  the use of its patent.

16          However, the damages you award in this case, if any,

17  are meant to compensate the patentholder and not to punish the

18  Defendant.  You may not include in any damages award an

19  additional amount as a fine or a penalty above what is

20  necessary to fully -- to fully compensate the patent owner for

21  the infringement.

22          Also, damages may not be speculative, and MTel must

23  prove the damages in this case for HTC's alleged infringement

24  by a preponderance of the evidence.

25          I'll give you more detailed instructions on the

1    calculation of damages regarding the alleged infringement of

2    the Defendant regarding the patent-in-suit at the conclusion of

3    the trial, including giving you more specific instructions with

4    regard to the calculation of a reasonable royalty.

5           However, the fact that I'm instructing you now about

6    damages is not meant to indicate that MTel is entitled to

7    recover damages.

8           Also, ladies and gentlemen, throughout this trial,

9    you're going to be hearing from a number of witnesses, and I

10   want you to keep an open mind while you're listening to all the

11   evidence and not decide any facts in this case until you have

12   heard all of the evidence from all of the witnesses.

13          While a witness is testifying, it's important for you

14   to remember that you will have to decide the degree of

15   credibility and believability to allocate to the witnesses and

16   the testimony that they give.

17          So while each of the witnesses in this case are

18   testifying, you should be asking yourselves things like this:

19   Does the witness impress you as being truthful?  Does he or she

20   have a reason not to tell the truth?

21          Does he or she have any personal interest in the

22   outcome of the case?  Does the witness seem to have a good

23   memory?  Did he or she have an opportunity and ability to

24   observe accurately the things they testified about?

25          Did the witness appear to understand the questions

1   clearly and answer them directly?  And of course, does the

2   witness's testimony differ from the testimony of any other

3   witness, and if it does differ, how does it differ?

4          These are some of the kinds of things that you should

5   be thinking about while you're listening to each of the

6   witnesses testify in this case.

7          Also, I want to talk to you briefly about expert

8   witnesses.  When knowledge of a technical subject may be

9   helpful to the jury, a person with special training and

10  experience in that particular field -- we refer to them as an

11  expert witness -- is permitted to testify to you, the jury,

12  about his or her opinions on those technical matters.

13         However, you're not required to accept an expert's or

14  any other witness's opinion.  It's up to you to decide whether

15  you believe an expert witness, or any other witness for that

16  matter, and whether you believe what they're telling you is

17  correct or incorrect and whether or not you want to believe

18  what they say.

19         Now, I anticipate that there will be expert witnesses

20  testifying in support of each side in this case.  But when an

21  expert witness testifies, you will have to listen to their

22  qualifications, and when they give an opinion, you'll have --

23  and explain the basis for it, you'll have to evaluate what

24  they've said and whether or not you believe it and to what

25  degree, if any, that you want to give it weight.

1          Remember, ladies and gentlemen, judging and

2     evaluating the credibility and believability of each and every

3     witness is a very important part of your job as jurors.

4          Now, during the trial, it's possible there will be

5     testimony -- testimony from one or more witnesses that will be

6     presented to you through what's called a deposition.

7          In trials such as this, it's difficult, if not

8     impossible, to get every witness in -- in court, in person at

9     the same time.  So lawyers from each side, before the trial,

10    take the depositions of the witnesses.

11         In a deposition, the witness is present, a court

12    reporter is present, and the witness is sworn in and placed

13    under oath just as if they were personally in court.  Then

14    lawyers for each of the parties ask the witness questions, and

15    those questions and the witness's answers are recorded.

16         Portions of those recordings -- most of the time they

17    are video recordings.  Portions of those recordings of those

18    questions and answers may be played back to you as a part of

19    this trial so you can see the witness and hear their testimony,

20    even though they're not personally or physically present in

21    court.

22         That deposition testimony is entitled to the same

23    consideration, insofar as possible, and is to be judged as to

24    the credibility, weight, and otherwise considered by the jury

25    in the same way as if the witness had been present and giving

1    their testimony in person from the witness stand in open court.

2           Now, during the trial, ladies and gentlemen, it is

3    possible that the lawyers in this case will make certain

4    objections.  And when they do, I'll make rulings on those

5    objections.  It's the duty of an attorney for each side to

6    object when the other side offers testimony or other evidence

7    that the attorney believes is not proper under the orders and

8    rules of the Court.

9           Upon allowing the testimony or other evidence to be

10   introduced over the objection of an attorney, the Court does

11   not, unless expressly stated otherwise, indicate an opinion as

12   to the weight or effect of that evidence.

13          Excuse me.

14          As I've stated before, you, the jury, are the sole

15   judges of the credibility and believability of all the

16   witnesses and the weight and to what effect to give to all of

17   the testimony and evidence in this case.

18          Now, I want to compliment the parties in this case at

19   this point because prior to today, there has been a lot of work

20   put in by both sides and the Court in going through the

21   admissibility of exhibits that are going to be shown to you

22   through the trial.

23          Arguments regarding the admissibility of exhibits

24   have already been presented and already been considered by the

25   Court prior to today -- to today, and I've ruled on those

objections and those exhibits, and, therefore, we have a list
of pre-admitted exhibits that can be shown to you by either
party throughout the trial without having to go through their
presentation, any objections, any arguments, and any rulings.

You may not appreciate it, but I can promise you,
this process has saved you a lot of time during the trial so
you will not have to listen to all that.

And the parties on both sides have worked diligently
with the Court to raise those issues and have them argued and
disposed of prior to today.  So I compliment them for their
work in advance of the trial.

However, that being done, it's still possible that
objections will arise during the trial.  If I sustain an
objection to a question addressed to a witness, then you, the
jury, must disregard the question entirely, and you may make no
inference or -- or speculate as to what the witness would have
said if the Court had permitted them to answer the question.

However, if I overrule an objection to a question
addressed to a witness, then you should consider the question
and the answer just as if no objection had been made.

You should know, ladies and gentlemen, that the law
of the United States permits a judge, such as myself, in
federal court to comment to the jury on the evidence in a case,
but those comments by the judge are not evidence and are only
an expression of the judge's opinion, and they may be

1    disregarded by the jury, because I remind you, it is the jury

2    that is the sole judges of the facts and the credibility of the

3    witnesses and the weight to be given to the evidence.

4          Even though the law permits me to comment on the

5    evidence in this case, as I indicated to you early -- earlier

6    today in jury selection, I intend to try very hard not to

7    comment on any of the evidence or any of the witnesses

8    throughout the trial.

9          As you can see, the court reporter in front of me,

10   Ms. Holmes, is taking down everything that's said in the

11   courtroom.  She has since we convened this morning, and she

12   will throughout the trial.

13         However, the written transcript of everything that's

14   said in court is prepared in case there is an appeal of this

15   trial to an appellate court.  That transcript will not be

16   available for your use in deliberating on your verdict or

17   deciding the questions in this case.  So you're going to have

18   to rely on your memories of the evidence in this case.

19         In a moment, each of you are going to be given a

20   juror notebook.  In the back of those notebooks, you'll find a

21   legal pad with blank pages where you can take notes throughout

22   the trial.  You'll also find a pen in these notebooks that you

23   can use for that purpose.

24         It's up to each of you to decide whether or not you

25   want to take notes during the course of the trial, and if you

1    do, how detailed you want those notes to be.  But if you take

2    notes, remember, those notes are for your own personal use.

3    You're going to have to rely on your memory of the evidence,

4    which is why you should pay close attention throughout the

5    trial to each and every witness.

6         You should not abandon your own recollection because

7    some other juror's notes indicate something differently.  Your

8    notes are to refresh your recollection, and that's the only

9    reason you should be keeping them.

10        Now, I'm going to ask our Court Security Officer at

11   this time to pass out the juror notebooks to each of the

12   members of the jury.

13        In these notebooks, ladies and gentlemen, you'll see

14   that you each have a copy of the single asserted patent in this

15   case, the '946 patent.

16        You'll also find that you have what we call witness

17   pages in this notebook.  For each witness that we expect may

18   testify, you'll find that there's a page with a head and

19   shoulder's photograph of the witness at the top of that page,

20   their name underneath their photograph, and additional lines

21   below that that you can also place notes on, if you wish to.

22        Also, you'll find, as I mentioned, a legal pad in

23   there that you can take notes on, as well as a pen.  You'll

24   also find in there a list of the claim terms that the Court has

25   already construed and defined, as well as the corresponding

1    definitions that the Court has given you to use in regard to

2    the trial.

3            Whenever you leave each day to go home, you should

4    make sure that those notebooks are left on the table in the

5    jury room.  They should either be on the table in the jury

6    room, or they should be in your possession in the courtroom as

7    you have them now.

8            There may be times, ladies and gentlemen, when we

9    take a brief recess, and I will tell you simply leave your

10   closed notebooks in your chairs.  And you can do that.  But

11   unless I tell you otherwise, they either need to be in your

12   personal possession or they need to be on the table in the jury

13   room.

14           Now, we're going to have opening statements in just a

15   few minutes, but I want to give you -- before that, I want to

16   give you a brief roadmap of how the trial is going to be

17   structured before we get on to those opening statements.

18           After the opening statements are complete, the

19   Plaintiff, MTel, will present its evidence in support of its

20   contentions that the asserted claims of the patent-in-suit have

21   been and continue to be infringed by the Defendant, HTC.

22           To prove infringement of any claim, MTel must

23   persuade you that it is more likely true than not true that HTC

24   has infringed the asserted claims by a preponderance of the

25   evidence.

1           Now, after the Plaintiff, MTel, has presented its

2    case and rests, then the Defendant, HTC, will present its

3    evidence, its evidence that the asserted claims of the

4    patents-in-suit -- or the patent-in-suit is invalid.

5           To prove invalidity of any claim, the Defendant, HTC,

6    must persuade you by clear and convincing evidence that the

7    claim is invalid.  And in addition to presenting its evidence

8    of invalidity, HTC will put on evidence responding to MTel's

9    proof regarding infringement and damages.

10          Then HTC, the Defendant, will rest its case.  After

11   the Defendant has rested, the Plaintiff, MTel, will be given an

12   opportunity to put on additional evidence responding to HTC's

13   evidence that the claims of the patent-in-suit are invalid and

14   to offer any rebuttal evidence regarding infringement and

15   damages.  This is referred to as the Plaintiff's rebuttal case.

16          After the Plaintiff puts on and presents its rebuttal

17   case, then all of the evidence will have been presented to you,

18   the jury.  And after all of the evidence has been presented to

19   the jury, I will then provide you with my final instructions on

20   the law to be applied in this case.

21          Those final instructions from the judge to the jury

22   are often called the Court's final jury charge.  The lawyers --

23   after I give the charge, after I give you my final

24   instructions, the lawyers will then present their closing

25   arguments.  After you've heard closing arguments from the

1   attorneys, then you will retire to deliberate in the jury room

2   and reach your verdict.

3          I remind you of my instruction that I've given you

4   several times and will continue to give you throughout the

5   trial that you are not to discuss the case among yourselves or

6   with anyone else.

7          Only after you've heard all the evidence and I've

8   instructed you to retire to the jury room and deliberate on

9   your verdict, then and only then should you discuss the case

10  and the evidence in this case among yourselves.  And as I've

11  mentioned, at that point, it becomes your duty to discuss the

12  evidence and the case among yourselves.

13         I remind you, ladies and gentlemen, because of the

14  nature of this case, that you should leave your cell phones

15  outside the courtroom.  They are not evidence in this case, and

16  whether they are an HTC phone, an Apple phone, a cell --

17  cell -- Samsung -- I'm sorry -- a Samsung phone, or any other

18  phone, they are not evidence in this case and -- and should not

19  be considered by you in any shape, form, or fashion.

20         I remind you also that the lawyers and the witnesses

21  and the party representatives have been instructed not to talk

22  to you.  So during breaks and recesses and coming and going

23  each day, they're not going to engage in conversation with you.

24  Don't hold that against them.  They're not being rude.  They're

25  simply doing what the Court's instructed them to do.

```
 1              All right.  With those instructions, we're now going
 2    to hear opening statements from the parties.
 3              We'll begin with the Plaintiff MTel's opening
 4    statement, followed by the opening statement of the Defendant.
 5              The Plaintiff may present its opening statement to
 6    the jury at this time.
 7              MR. DACUS:  Thank you, Your Honor.
 8              It's my understanding, Your Honor, we have
 9    30 minutes.  If the Court will please let me know when I have
10    5 minutes remaining.
11              THE COURT:  I thought it was 25 minutes, Counsel.
12              MR. DACUS:  25, okay.  Well, if you'll let me know
13    when I have 5 minutes of my 25.
14              THE COURT:  I will let you know when you have
15    5 minutes of your 25.
16              MR. DACUS:  Thank you, Your Honor.
17              Good afternoon.
18              THE COURT:  Go ahead.
19              MR. DACUS:  Thank you, Your Honor.
20              Good afternoon.
21              Let -- let me start this afternoon exactly where I
22    started this morning, and that is to say, on behalf of myself
23    and on behalf of Mr. Fitton and on behalf of MTel, a very
24    sincere thanks to you.  It's one -- it's one thing to say
25    thanks to you when you're going to spend a couple of hours here
```

1    in the morning in jury selection, and it's quite a different --

2    and another thing to say thanks when you're going to spend an

3    entire week here.

4         As I told you this morning, we would not be here if

5    this case was not important to us.  No doubt when you walked

6    through those doors this morning, you, like every other juror,

7    asked why you're here.  You knew you were here to be a juror,

8    but you didn't know exactly what the case was about or what

9    your role would be.

10        You now know enough, based on this morning and what

11   the Court has told you, to know that MTel is the owner of

12   patent 5,754,946, titled Nationwide Communication System.  As

13   the Court told you, it relates to the transmission of data

14   wirelessly, including on cell phones.

15        You also know that at least since late 2008, through

16   the time that the patent expired in May of 2015, HTC has sold

17   over 51 million phones and tablets that use the '946 patent.

18        And let me -- let me say one other thing about that.

19   There was some issue this morning about how does the fact that

20   they get these phones from their Taiwanese parent affect the

21   issue here.

22        I believe the Court will instruct you in its final

23   instructions that if you sell or offer for sale an infringing

24   product in the United States, even if you get it from your

25   Taiwanese parent, then you're liable for infringement.  And I

```
 1   believe that's the case here, and that's what the evidence will
 2   show.
 3          So the reason we're here, at least from MTel's
 4   perspective, is simple.  We're here to ask for a jury's help.
 5   It's exactly what the video said to you this morning.  When
 6   you're a patent owner and someone is trespassing on your
 7   property, taking your property without paying for it, you come
 8   to a United States Federal District Court and you ask a jury
 9   two questions.
10          You ask them, in this case:  Does HTC infringe the
11   '946 patent?  That means do they use the patent.  And then you
12   ask them:  If so, what dollar amount should HTC pay for the use
13   of that patent?  And that's the short answer to why we're here.
14          But as in any lawsuit, I think it's important to not
15   only talk about why you're here, but how did we get here?  And
16   in this case, I think it's actually more important than in
17   most.
18          And here's why I say that.  I'm going to ask you to
19   step back in time with me.  I'm not going to ask you to close
20   your eyes because we're a little bit after lunch and I don't
21   want you to go to sleep, but step back to the early to
22   mid '90s.
23          Some of you that are my age or older, you can
24   remember that time.  You can remember what was going on.  Some
25   of you who are a little younger, I'm going to try to describe
```

1    it.

2            So in the early to mid '90s, a lot of people had a

3    little device on their belt or a little patch -- or a pouch on

4    their belt that carried a device called a pager.  And that

5    pager had the ability, at least at first, to receive short

6    messages.  Very similar to what text messages and emails are

7    today.

8            There was a group literally four hours east of here

9    down Interstate 20 in Jackson, Mississippi, at a company called

10   MTel.  MTel owned what was known as the SkyTel paging business.

11   Some of you who are my vintage and older may remember the old

12   SkyTel pagers.  They were literally the preeminent, the best

13   paging network in the country.

14           Those inventor -- those engineers at MTel literally

15   were some of the best and brightest in the country.

16           Mr. Bill Hays, are you in here?

17           Mr. Hays, would you stand up, please?

18           This is Bill Hays, 74 years young, and inventor of

19   the '946 patent.  He's one of those engineers at MTel in

20   Jackson, Mississippi more than two decades ago that had an

21   idea.

22           Thank you, Mr. Hays.

23           His idea was this:  Look, these pagers, they only

24   receive information, but we think it would be incredibly

25   beneficial and useful if not only did they receive information

1    but if they could send information.

2           And in addition, what you may or may not remember is,

3    at that time, a pager was just a regional or local device.  In

4    other words, if you were in East Texas, you could send a

5    message.  But someone in East Texas couldn't send one to

6    someone in Mississippi or New Mexico.

7           So these engineers set about to develop the country's

8    first two-way, meaning you could both send and receive,

9    nationwide wireless communication system.  And in doing that,

10   as you might imagine, they encountered a lot of problems.

11   Because if there weren't problems, someone would have already

12   done it before.

13          And examples of the problems they encountered were

14   these:  One is, how do we get this information or data

15   communicated through these airwaves?

16          What you'll come to know through the evidence in this

17   case is that information communicated through the air, which we

18   think is unlimited.  The space there is actually not limited.

19   It's communicated along a spectrum, which I think about in

20   simple terms as a pipe, okay?  And there's only so much data

21   that can go through this spectrum or pipe.

22          And Mr. Hays and others, he'll take -- he'll be the

23   very first witness that you'll hear from.  He'll take the stand

24   and he'll tell you:  Yeah, we had to figure out how to fit this

25   data into these pipes.

1            They also had to figure out, how do we get this data
2    transmitted quickly?  We all know, those of us who use cell
3    phones now, we don't want to wait on the Internet to pull up.
4    We don't want to wait on our texts.  We don't want to wait on
5    emails.

6            So they were trying to figure out:  How do we
7    communicate information quickly, efficiently, and without using
8    up all the available capacity?

9            The truth is, they were very successful in developing
10   that network.  In fact, the United States Government granted
11   them what was called a Pioneer Preference.  In recognition for
12   the work that those engineers at MTel did, the Federal
13   Communications Commission, which is the arm of the government
14   that controls communications in the United States, granted to
15   them a Pioneer Preference.

16           Now, there's also another thing that you need to know
17   about what these engineers were doing.  They were not only
18   solving the problems of the day, in other words, the problems
19   that they saw immediately that they needed to fix in order to
20   develop this two-way paging system, they were looking into the
21   future, and they were thinking what problems might occur in the
22   future.

23           And so what did they do with all these solutions to
24   the problems?  Well, they committed them to writing.  For many
25   of them, they submitted patent applications, and literally

1   dozens and dozens of patents came from the work of those

2   engineers, including the '946 patent that brings us here today.

3         And so what you'll see on the screen here is sort of

4   the evolution of those SkyTel pagers.  From 1995, a pager that

5   could only receive information to 1997, a pager that could both

6   send and receive information.  And then in 2008, of course, an

7   HTC phone that we contend uses the '946 invention.

8         Let's step forward in our timeline.  Remember, we're

9   saying:  How did we get here on September 19th, 2016, in this

10  courtroom?

11        In May of 1998, having had a patent application in

12  its hand for more than a couple of years, the United States

13  Patent and Trademark Office granted the '946 patent.

14        Now, let's talk about the time period as we walk

15  along our chronology from 1999 to 2007.  For those of us who

16  have gray hair like I do, or more, we know in the very late

17  '90s and early 2000s what happened.  A device like this came

18  along, a cell phone, right?

19        And memory that, at first, all we could do on this

20  device was talk.  But because we could talk, pagers became not

21  as required.

22        Now, I'm not talking about the technology that

23  Mr. Hays and his group had developed of how to effectively

24  transmit wireless information, but the pager itself.  Rather

25  than needing to send a page to someone to give them a message,

1    we could simply pick up the phone and call them.

2              And I tell you that for a reason.  In the course of

3    this lawsuit, HTC has said at times:  Hey, the value of this

4    SkyTel business decreased over time.  It went down over time.

5    And they may try to tell you that in this lawsuit.

6              But if they do that, I want you to be on high alert,

7    and here's why.  I'm not saying that it's a trick, but I'm

8    saying that sometimes you need to be on high alert for what

9    lawyers tell you.

10             The issue in this lawsuit is not did the value of a

11   paging business go down.  We all know it did.  The issue is

12   what's the value of that technology in the '946 patent.  And

13   that's what you're ultimately going to be asked to decide if

14   you decide they use that invention.

15             So there's several sales of the SkyTel business which

16   eventually culminate in March of 2008 with a company by the

17   name of Velocita, owned by Mr. Andrew Fitton, buying those

18   SkyTel assets, the SkyTel paging business, the entire business,

19   including the '946 patent.

20             What happens in 2008 in addition to that purchase?

21   Well, there's something that you see on the screen there.  It's

22   called the data explosion.  And you're probably saying:  Well,

23   what in the world is he talking about there?  And that's a

24   legitimate question.

25             Remember that in late 2007, a company by the name of

Apple did something with these cell phones.  Remember we could only talk on them up until 2007, and then in 2007, what happened?  All of a sudden, we can communicate by text, email, Internet, and video.  All of that is data or information.

And not only was it Apple that came out with a smartphone, but Samsung did, LG did, HTC did.  And so now we have millions of people sending data wirelessly through the airwaves.

And so what happens?  The engineers at HTC and these other smartphone manufacturers have problems.  What are their problems?  Well, how do we send all this data and information quickly and efficiently?  How do we send it through this limited capacity pipe called spectrum?  Do those problems sound familiar?

They were the same problems that Hays and his group had encountered more than two decades before.  And how did they resolve those problems?  At least HTC solved it by using what is the '946 invention.

And of course, the problem with that is, when you use an invention, you need to pay for it.  And that's exactly what brings us here today to this courtroom, September 19th, 2016, is that starting in October of 2008, HTC began using the '946 patent to -- same -- to solve the same kind of problems that Bill Hays and his group had solved in the early '90s.  And they did that without ever paying a penny or a dime.

1          Now, the two questions that you're going to be
2   asked -- that's how we get here.  We'll go back to why you're
3   here.  What's your role?  I think it's important for you to
4   understand what the process is.

5          The Court's given you some indication of what your
6   role is going to be.  You know from the video this morning, you
7   know from what the Court's told you that the claims of the
8   patent, when you -- I'm not asking you to do it now, but when
9   you have time, look at the back of that patent.  You will see
10  numbered claims.  Each one has a number, one, two, three, four.

11         Something I didn't know before I started learning
12  patent law, a patent can contain many inventions, indeed most
13  patents do contain many inventions, and indeed this one does.

14         So there are two inventions, two claims at issue
15  here:  Claim 1 and Claim 4.  Those are the claims you're going
16  to be looking at.  And as the Court already told you, what
17  you're going to do is you're going to look at the claim
18  language and compare it to the product.

19         Now, I'm certain that before you walked through those
20  doors this morning, you had never conducted an infringement
21  analysis.  So I know this is a little foreign to you.  What --
22  so our job as lawyers is to help, is to provide the evidence.
23  I don't get to answer that question.  I really wish I did.  It
24  would make for a simple process.  But you answer the question.
25  Our job as lawyers is to provide the evidence.

```
 1            So Dr. Paul Prucnal, are you here?

 2            This is Dr. Paul Prucnal.  Dr. Paul Prucnal is one of

 3  the leading telecommunications experts in the country from

 4  Princeton University.  When we began to believe --

 5            Thank you, Dr. Prucnal.

 6            -- that HTC was infringing or using our patent, we

 7  asked Dr. Prucnal to evaluate that for us.  He's going to take

 8  the stand, and he's going to walk you through -- what you see

 9  on the screen here is Claim 1 of the patent.  He's going to

10  walk you through the language and the wording of this claim.

11            If you try to read it quickly, you're going to say:

12  Whoa.  And that's what I said, and I've read it a thousand

13  times.  But he'll walk you through step-by-step, and he'll

14  compare the language of that claim to an HTC product and how it

15  works.

16            So at a very high level -- and I'm quite certain I'm

17  going to do an injustice to Dr. Prucnal because I won't be

18  technically correct here -- I want to preview for you how these

19  HTC phones work, and then he'll match it up to the claim

20  language.

21            So you see here what we have is an example of Bob

22  sending an email message on his phone.  The message is up

23  above.  It says:  Here is the menu.  That's the text he typed.

24  And then he attaches the actual document.  He attaches the

25  actual menu.  He sends the message to Alice.
```

1     And what does Alice receive on her HTC phone?  She

2  receives the message that says:  To Alice, from Bob.  She

3  receives the text.  Here's the menu.  But then she receives a

4  symbol -- let's just called it a symbol.  It's a button that

5  she can click or select or tap if she actually wants to

6  download the menu.  She doesn't receive the menu itself.

7     And if she so chooses, if she taps or clicks or

8  selects on that button, then it sends a message back to the

9  communications network and asks for the menu, at which time the

10 menu is actually transmitted to her, and that's what you see on

11 her phone.

12    Dr. Prucnal and others will tell you about all the

13 advantages and why HTC and others have that feature in their

14 phone.  But he'll walk you through Claim 1 and show you how

15 each and every one of these elements of Claim 1 is used by HTC.

16    Those green checkmarks are simply something you can

17 do as you go along.  When he checks off an element, you can

18 decide whether or not you think he's proven to you that, in

19 fact, that element is in the HTC phone.

20    If you decide that it is, you're going to be asked to

21 decide what amount of money should HTC pay for the use of the

22 patent.

23    The Judge has already told you that there's some

24 specific law here as to what they're required to pay.  They're

25 required to pay a minimum, in no event less than a reasonable

1    royalty.

2              In other words, they're required to pay a minimum of

3    a reasonable royalty, which begs the question, what in the

4    world is a reasonable royalty and how do I calculate it?

5              Walt Bratic, are you in the courtroom?

6              This is Mr. Walt Bratic.  Mr. Bratic is a CPA down in

7    Houston.  Mr. Bratic has devoted his entire professional life,

8    more than 30 years, to valuing patents and to evaluating

9    damages in patent cases like this.  We've asked him, as part of

10   this case and his work, to evaluate the value and the damages

11   that MTel would be entitled to if, in fact, there was

12   infringement.

13             He's going to tell you that what the law requires --

14   and I think the Judge will tell you this before you retire to

15   deliberate -- is you're required to conduct a hypothetical

16   negotiation.

17             And you're probably saying what in the world does

18   that mean?  It's simple.  You're supposed to assume that HTC

19   had done the right thing in 2008, and they had come to a table

20   and sat down with MTel and said:  Hey, we want to and need to

21   use your '946 patent.  What can we pay you per phone to

22   compensate you for that?  That's what a hypothetical

23   negotiation is.

24             As part of that hypothetical negotiation, the law

25   says you need to consider many factors, one of which is what's

1    the value or benefit created by the '946 patent?

2         Mr. Bratic is going to walk you through, just like

3    Mr. Prucnal is going to walk you through, more detail than

4    you've ever wanted, but the kind of detail that you need in

5    order to make an informed decision on these questions.

6         Mr. Bratic is going to -- this is just an example of

7    one of the schedules or charts he's going to show you, and he's

8    going to tell you that for each phone, the '946 patent creates,

9    at a minimum, $7.59 of value or benefit per phone.

10        And then he's going to tell you that you're supposed

11   to decide in this hypothetical negotiation how much of that

12   would these parties have agreed should go to the patent owner?

13   How much of that $7.59 of value should be paid to MTel for the

14   use of the patent.

15        And after he considers all the factors, he'll tell

16   you what the royalty rate is.  So if you look on the slide

17   that's on the screen, you see where it says:  Royalty rate

18   97 cents.

19        And that's what he'll say.  Of that $7.59 of value

20   per phone that's created every time these folks use it on

21   51,000,000 phones, he believes MTel should have been

22   compensated or paid 97 cents.

23        And, of course, then it becomes just a matter of

24   simple math, 97 cents times the 51.4 million phones that they

25   sold in the United States before the patent expired.

1           Let -- let me say one thing about the patent

2    expiration.  That's something else that HTC said to you this

3    morning.  And I want to make sure we're clear on it.

4           We don't -- we don't seek any -- MTel doesn't seek

5    any compensation beyond the date that the patent expired.  When

6    you're a patent owner, you make a bargain and a deal with the

7    Patent Office.

8           The deal is, if you will disclose your patent to the

9    public, your invention to the public so that they can use it in

10   the future, for the first 20 years, you have the sole or

11   exclusive right to use it.

12          Beyond those 20 years, everyone can use it for free.

13   HTC can -- from May 2015 forward, they can use the '946

14   invention for free.  That's the bargain that we, as the patent

15   owner, made with the Patent Office.  And we don't attempt in

16   any way to renege on that.

17          But the other part of that bargain is, if someone

18   uses your patent before the expiration of the patent, they need

19   to pay a fair and reasonable value for the use of that patent.

20          Now, let me talk about another topic that the Court

21   mentioned to you:  Invalidity.  In the course of this lawsuit,

22   HTC, like many corporations, has sort of had a laundry list of

23   excuses.

24          The first excuse was:  We don't use the patent.

25          The second excuse was:  Even if we use it, we don't

1    think it's worth much money.

2         The third excuse has been:  Well, even if those two

3    things are true, then we don't think your patent is valid.

4         And I don't know exactly what they're going to say

5    about why the patent is invalid.  They've said a lot of things,

6    but I don't know exactly what they're going to say to you.

7         THE COURT:  Five minutes remaining.

8         MR. DACUS:  Thank you, Your Honor.

9         But I want you to remember a couple of things about

10   this issue.  One is they're going to get to stand up here in a

11   minute and speak to you.  I'm not going to get a chance to

12   respond.  The way we will respond is whatever they say the

13   reason is for the patent to be invalid, we'll put on an expert,

14   Dr. --

15        Dr. Jay Kesan, will you stand up?

16        This is Dr. Jay Kesan, again, one of the leading

17   telecommunications experts in the country.  And Dr. Kesan will

18   testify as to why the United States Patent and Trademark Office

19   got it right, why, after looking at this patent for a couple of

20   years and issuing the patent, it was absolutely, and still is,

21   a valid patent.

22        Let me say another thing about invalidity, and that's

23   something we talked about this morning and the Court's told

24   you.  There's a presumption that the patent is valid if it's

25   issued by the United States Patent and Trademark Office.  And

1    that, of course, makes sense.  If the experts at the Patent

2    Office have reviewed it and issued the patent, there should be

3    that presumption.

4            So in order to overcome that, they have to prove by

5    clear and convincing evidence that, in fact, this patent was

6    valid.  I don't think the evidence will support that, but I

7    want you to keep that in mind.

8            Finally, before I sit down, I told you there's a long

9    laundry list of excuses that they provided.  There's another

10   one.  They say -- HTC says:  Well, even if we use this patent,

11   even if it's valid, even if it's worth a bunch of money, we

12   think we have a license.  We think we have permission to use

13   it.

14           You remember from the video this morning that if you

15   pay money, you can actually acquire a license.  You can acquire

16   the right.

17           Here's what I'll say about that, again, I don't know

18   what they're going to say because they've said many things

19   during the course of the lawsuit, but I know this:  They're

20   never going to be able to show you any agreement or document

21   where MTel, the patent owner, is a party to that agreement and

22   HTC is a party to the agreement, and the agreement says you,

23   HTC, have the right to sell 51 million phones.  You won't find

24   an agreement that says they have the right to sell one phone.

25           If they say what they've said in the course of the

```
 1    lawsuit, it will be:  Well, there's these other agreements over

 2    here with Verizon and other people that we think we should

 3    share the benefit of.

 4           If we go down that road -- and I don't know if we

 5    will -- again, we'll put on evidence, and it will be detailed

 6    evidence.  You'll need to get your pencils out and take notes

 7    as to exactly why there is no license and there is no

 8    permission.

 9           I'm going to sit down now.  I won't have a chance to

10    speak with you again until we have closing arguments.  Our job

11    over the course of the next four days or so will be to present

12    the evidence to you so that can you make an informed decision.

13           We very much look forward to that opportunity, and I

14    very much look forward to the opportunity at the conclusion of

15    that evidence to talk with you about -- about it and what it

16    shows.

17           Thank you.

18           Thank you, Your Honor.

19           THE COURT:  All right.  That completes the

20    Plaintiff's opening statement.

21           The Defendant may now present its opening statement

22    to the jury.

23           Would you like a warning on your time, Mr. Selinger.

24           MR. SELINGER:  Yes, Your Honor.  Could I get five

25    minutes and one minute?
```

```
 1              THE COURT:  Yes, sir, you may.
 2              MR. SELINGER:  Thank you.
 3              THE COURT:  Proceed when you're ready.
 4              MR. SELINGER:  I am ready.
 5              May it please the Court.
 6              Ladies and gentlemen of the jury, Mr. Gillam,
 7    Ms. O'Brien, and I want to add our thanks for your service here
 8    today and this week.  We understand it really is an imposition
 9    on you.  But your commitment to the rule of law allows us to
10    have our client exercise its right, its constitutional right,
11    to a trial by jury.  So thank you very much.
12              Mr. Gillam and I are proud to represent HTC America.
13    You have heard that this case involves -- there we go.  You
14    have heard that the case involves an expired patent.  And --
15    and the two sides now agree that it does.  There's -- there's
16    still a dispute, and that's why we're here.
17              Now, not surprisingly, this case is about technical
18    details that are important to the disagreement we are asking
19    you to decide.  So thank you in advance for paying attention to
20    those technical details.
21              But before we go into -- into the details, let me
22    make two introductions.  First, since everyone else has done
23    so, let me briefly say, I am Jerry Selinger.  My wife and I
24    moved to Dallas in 1979.  I've practiced law there ever since.
25    I have two grown children.  And I have to say -- and I've got a
```

1   young granddaughter.

2          Let me also introduce HTC America, which -- which

3   you've heard a little bit about.  HTC America has its

4   headquarters in Seattle, Washington.  About a hundred men and

5   women, including Ms. O'Brien, work in -- in this office

6   building.  It's not theirs -- it's not theirs exclusively, but

7   they're there.  Another 60 men and women work for HTC America

8   in locations around the United States.  Since -- there we go --

9   since June of 2010, HTC America began selling HTC Corporation

10  products.

11         Now, you've heard that HTC Corporation is not a

12  Defendant in this case.  This case is about HTC America.  HTC

13  America's largest customers are companies that you likely have

14  heard about:  AT&T, Verizon, Sprint, and T-Mobile.

15         Now, before June of 2010, HTC Corporation, the

16  Taiwanese company, sold -- sold directly to those customers in

17  the United States.  In June of 2010, HTC America began doing

18  that.

19         Now, you have in front of you Defendant's Exhibit 52.

20  And this is the agreement between HTC America, the company

21  headquartered in Seattle, and HTC Corporation.  And you'll see

22  effective June 1st of 2010 between HTC Corporation and HTC

23  America.

24         You've heard some -- you've heard -- you've heard a

25  bit about MTel -- the MTels, and I want to spend a little bit

1    of time talking about some of the detail that you will hear

2    over time that we haven't yet gotten to.

3         There was a company in Jackson, Mississippi, in the

4    1980s that -- had a one-way pager system, and Motorola supplied

5    the pagers and equipment for that company.  In the early '90s,

6    this Mississippi company decided that it was going to enter the

7    two-way pager business.  And in September of 1995, it began

8    nationwide operation of a two-way pager system.

9         Plaintiff is not that company, even though it has a

10   very similar name.  That company's name was Mobile

11   Telecommunications Technologies, Incorporated.  The Plaintiff

12   is Mobile Technology Communications Limited.

13        So how did this company get the '946 patent and its

14   name?  Well, let's go back to 1999.  In 1999, MCI Corporation

15   bought that company, that MTel with the SkyTel business, for

16   $1.8 billion.  That was for the entire nationwide paging

17   business.  It was -- it was leases and hardware and software

18   and an operating business, and as we've heard from counsel,

19   dozens and dozens of patents and trademarks and all sorts of

20   intellectual property.

21        Now, in 2006, after MCI went into bankruptcy, Verizon

22   bought the business out of bankruptcy -- bought the whole

23   business again, the paging business, the assets, the hardware,

24   the software, the offices, and the dozens and dozens of patents

25   that we've heard about.

1          Now, about a year later, Verizon sold the entire

2    business -- again, the pager business, the hardware, the

3    software, all of the other assets and the dozens and dozens of

4    patents to a company called Bell Industries for $23 million.

5          As part of that deal -- and there's no -- I don't

6    think there's any dispute, Bell Industries granted back to

7    Verizon a royalty-free perpetual patent license for all of the

8    patents that were being transferred to the new company, to Bell

9    Industries.  One of those patents was the '946 patent.

10         A year later Bell Industries flipped the business.

11   Again, certainly the pager business, as Counsel said, was

12   deteriorating, but there was still hardware and software and a

13   business and dozens and dozens and dozens of patents, one of

14   which was the '946 patent.

15         Now, in 2008, Mr. Fitton, actually owned Velocita

16   company.  It's one of his companies.  In 2010, he moved the

17   patents from Velocita to a company he also owned called

18   ST Networks.  He moved it a couple of times.  It went to North

19   American IP Holdings.  And that was the name of the company

20   until shortly before the litigation began.

21         But rather than filing this lawsuit as North American

22   IP Holdings versus HTC America, Mr. Fitton changed the name to

23   be very similar to the company that had been the Mississippi

24   pager company.  Let me be clear, it is not the same company.

25         Now, let me turn to how the '946 patent came to be.

1    I mentioned that the Mississippi company, in the early 1990s,

2    decided that it wanted to enter the two-way paging business.

3         Long before the company had made decisions on the

4    final technical details of the commercial system, it filed a

5    number of patent applications.  Two of those applications bear

6    on the issues that you are here to help us decide.

7         In 1992, the Mississippi MTel filed an application

8    that became what we call the '403 patent, and the '403 patent

9    is -- is the parent of the '946 patent.  The '403 patent

10   described automatically eliminating errors before a message was

11   shown on a mobile device to a user.

12        Now, you won't hear that the MTel inventors actually

13   invented that technology.  That was already conventional

14   technology that they had -- they borrowed from somewhere else.

15        Now -- but it's described in the '403 patent.  And

16   what -- and what the '403 patent says is, if a message is not

17   correctly received by the mobile unit, by the pager, the mobile

18   unit would automatically send a message back to the

19   communications network, to the brains, to the network operation

20   center saying:  Please resend.  And it worked.

21        Now, Plaintiff is not suing us on the '403 patent.

22   So you're saying:  Why am I talking about it?  Well, the reason

23   is because, in 1993, the Mississippi MTel filed another

24   application to solve a problem that they believed they might

25   have created by using this automatic error correction in the

1    previous -- in the 1992 patent application, and it's this later

2    application that became the '946.

3         And so I've got a timeline here.  You know, the --

4    the -- let's see -- oops.  Let's get -- let's get us out of

5    there.

6         Okay.  So the '403 patent -- so the '40 -- anyway, I

7    don't need the timeline for that.

8         So what happened is the '403 was filed.  The next

9    year the application for the '946 was filed.  MTel then took

10   years in order to get the patents issued.

11        Now, the -- so I'm going to get a little technical

12   help while I'm talking.  The -- the '92 problem, the automatic

13   error correction, and the -- there we go.  Thank you.

14        The '92 problem, automatic error correction, and --

15   and the '93 proposed solution, user optional error correction,

16   are described in the '946 patent.

17        And what the '946 patent says is that the concern was

18   that automatic error correction, while it worked, might consume

19   too much airtime.  The pager system, unlike cellular, which is

20   broadband, was narrowband.  And that meant that sending

21   correction messages back and forth could clog the system.

22        So the Mississippi company's patent lawyers spent

23   five years trying to get the Patent Office -- trying to

24   convince the Patent Office to allow a patent on this proposed

25   solution, the user optional switch feature.

1        Now, the lawyers continued on, even though the

2   commercial network that MTel came out with in September of 1995

3   used conventional automatic error correction, not the user

4   optional switch feature of the '946 patent.

5        Now, over time the Patent Office rejected the --

6   MTel's efforts on five separate occasions, each time because

7   the examiner considered the claims to be obvious and not worthy

8   of a patent.  Only after the Mississippi company's lawyers

9   repeatedly moved and narrowed the boundary lines, the claims,

10  did the examiner agree to grant the patent in 1998.

11       And His Honor mentioned the claims.  The claims are

12  the property line.  When you move your claims, when you narrow

13  the property, instead of a ranch, you may end up with a lot

14  less.  That was the negotiation that took place.

15       Plaintiff will hear -- we'll have live testimony

16  from -- from one of the named inventors, Mr. Hays.  HTC America

17  plans to offer additional testimony from the other surviving

18  inventors, the other five.  They won't be here in person, so I

19  will read questions and someone sitting in the witness stand

20  will read back the answers that each of these men previously

21  gave under oath.

22       Now, I want to quickly walk through some of the

23  details of what the inventors believed might be a solution in

24  1993.  Because the details matter.  What -- what I want to tell

25  you, though, before I get into these is that these technical

1    details going back 23 and 24 years really are important to

2    today's dispute.  Otherwise, I wouldn't subject you to it.

3            Now, let's start with the abstract.  This is the --

4    this is on the first page of the '946 patent.  And what it says

5    is the mobile unit includes a switch that allows a user to

6    request the network to retransmit a received message that

7    contains errors.

8            I also want to go to a paragraph in the '946 patent

9    in -- in the area called background.  And the last paragraph in

10   the background describes what -- what it calls a conventional

11   approach, which was this automatic error correction feature and

12   then the problem with that.

13           It says:  This technique ensured that the messages

14   are accurate but consumes a great deal of airtime.  And then it

15   would be desirable to reduce the needless transmission of some

16   message blocks.

17           So that was the problem that the '946 patent sought

18   to solve.  And what -- they did it with a button called the

19   request retransmission button.  And if you look at the top of

20   the figure, that's the parent, the '403 patent.  And if you

21   look at the top right-hand corner -- let me try this again --

22   you don't see a button.  But if you look below, you will see

23   request retransmission button 1622.

24           Now, I don't mean to say this is a magic button.

25   Their -- they also disclose that there were input switches, but

1   this was the solution.

2           Now, the '9 -- okay.  So we've talked about property.

3   What we're going to show you is that the MTel patent has a

4   narrow fenced-in property line.  HTC America and its

5   smartphones are in a different pasture owned by somebody else,

6   by HTC America.

7           Now, we've heard about the '946 patent, but we've

8   heard about what it is we're accused of doing.  Let's talk

9   about what the '946 patent doesn't disclose.  It makes no

10  mention of emails, email servers, attachments, photographs,

11  downloading attachments, touchscreens, or icons.

12          We have Dr. William Beckmann here today.

13          Dr. Beckmann, will you please stand briefly?

14          Dr. Beckmann has a Ph.D. from Cornell.  He started

15  his career teaching.  He was an adjunct professor in electrical

16  engineering at Rensselaer Polytechnic Institute.  He's a member

17  of the Institute of Electrical and Electronics Engineers.

18          He's got more than 35 years of technical experience

19  in the telecommunications field working some of the most

20  prestigious research facilities and companies in -- in this

21  country, if not the world:  Bell Telephone Laboratories, Bell

22  Telephone -- Bell Communications Research, IBM, Ameritech.

23          And for the past 13 years, he's been the president of

24  his own technical consulting company, Network Computing

25  Associates.  Dr. Beckmann works in the industry.  Dr. Beckmann

1   is here to tell us why HTC America does not infringe either of

2   the two claims.

3           Now, I'm actually going to put the claim up, and

4   please don't let it scare you.  As -- as Counsel have said,

5   lawyers read this a lot, and it still makes us nervous.

6           But what I want to point out to you is -- is right at

7   the top of No. 1, it's about a mobile unit.  And it's a mobile

8   unit for transmitting and receiving radio frequency signals to

9   and from a communications network.  That's the property line.

10  This is the boundaries defined by the deed.

11          THE COURT:  Five minutes remaining.

12          MR. SELINGER:  Thank you, Your Honor.

13          Now, we're going to tell you -- we're going to show

14  you that HTC America does not infringe.  And for time, I'm

15  going to skip this, but we will come back to it, and we will

16  talk about it.

17          There are three grounds of invalidity that we're

18  going to show you, and they're no surprise to the other side:

19  Written description, enablement, and obviousness.

20          The -- the written description is -- is very simple,

21  and that is because the claims got changed so much over the --

22  over the five years they were in the Patent Office, that

23  they're very different -- what -- what the claims came out,

24  what the patent lawyers were able to get from the Patent

25  Office, very different than what the men invented.

```
 1              That also gave rise to the second defense, which was

 2    lack of enablement.  Because of how the claims changed, the

 3    patent doesn't have enough information.

 4              We're also going to show you that -- two Motorola

 5    patents.  And remember, Motorola was supplying pagers.  Two

 6    Motorola patents that were not before the Patent Office were

 7    not -- were not cited by the examiner, invalidate the claims.

 8              We're going to apply the Kane '100 patent to show --

 9    and the level of ordinary skill in the art, the knowledge of

10    skill to invalidate Claim 1.  And we're going to combine Kane

11    with another patent called Zabarsky to invalidate the other,

12    the Dependent Claim No. 4.

13              Now, you met Mr. Bratic.  I want to introduce you

14    Mr. Vince Thomas, our damages expert.  What you're going to --

15    what you're going to -- what you've heard a little bit about so

16    far is HTC America sells devices to carriers, the carriers then

17    sell phones to users.  There's -- there's an AT&T store here in

18    Marshall.  There are a lot of store -- a lot of carriers stores

19    in Harrison County.

20              The user then buys data -- the data plan from the

21    carrier.  If you notice those blue arrows, back and forth,

22    user, carrier.  HTC America is not in that loop.  HTC America

23    is not part of that negotiation.  HTC America gets no money

24    from that.  The data plan is selected by the user.  The carrier

25    gets the money.
```

1         And that's important because Mr. Bratic says HTC

2    America should pay MTel a great deal of money because

3    smartphone owners supposedly save money by not downloading

4    attachments, and those consumer savings somehow became money in

5    HTC America's pockets.

6         Mr. Bratic's damage theory is unsupported by the

7    evidence.  Mr. Thomas will explain why Mr. Bratic used

8    unreliable data, speculative, and unsupported theories.

9         Now, I mentioned earlier that some of the largest

10   customers of HTC America included Verizon, AT&T, T-Mobile, and

11   Sprint.  Three of those four, T-Mobile, Sprint, and AT&T, have

12   already signed documents called patent license and settlement

13   agreements with MTel.

14        And you have in front of you the T-Mobile agreement.

15   We do have a dispute about whether HTC America is covered

16   within the words, and that will be something for you to decide.

17        We also have a disagreement about whether that

18   license that Bell Industries granted back to Verizon in 2006 or

19   2007 is sufficiently broad to cover sales that HTC America made

20   to Verizon.  And by the way, if it does, it may well be that

21   MTel is not entitled to recover any damages for any sales

22   before the time MTel actually sued us.

23        THE COURT:  One-minute warning.

24        MR. SELINGER:  Thank you, Your Honor.

25        You're going to hear Professor David Taylor from SMU

1   on that.  Professor Taylor is teaching today, but he will be

2   here for trial.

3          You heard briefly about the Pioneer Preference from

4   Mr. Dacus.  Three things.

5          The Pioneer Preference Award had nothing to do with

6   the '946 patent.

7          Second, at least one other company actually got a

8   Pioneer Preference Award at about the same time for broadband

9   frequencies for cellular.

10          And then finally, in addition to hearing Professor

11  Taylor, you're going to have a chance to see decisions from the

12  same Federal Communications Commission that awarded the Pioneer

13  Preference to that Mississippi MTel.

14          Version -- look at the bottom, Verizon owns a

15  controlling 55 percent ownership interest in the joint venture

16  and thus has control of Verizon Wireless.

17          On behalf of Ms. O'Brien and all of the 160 men and

18  women who work for HTC America, I want to thank you for your

19  attention to detail and for withholding judgment until you've

20  heard from both sides of this case.

21          Thank you.

22          THE COURT:  All right.  Ladies and gentlemen, you've

23  now heard opening statements from both of the parties.  At this

24  time, I'm going to ask, if there are persons present in the

25  courtroom who are designated as witnesses and who anticipate

```
 1   taking the witness stand during the trial, if you would

 2   collectively come forward at this time, we'll have the

 3   courtroom deputy administer the oath to all of you at once.

 4            If you're a witness in this trial, please come

 5   forward.

 6            (Witnesses sworn.)

 7            THE COURT:  Thank you.  You may return to your seats.

 8            Counsel, does either party wish to invoke the Rule?

 9            MR. GILLAM:  Yes, Your Honor.  Defendant wishes to

10   invoke the Rule.

11            THE COURT:  All right.  Is it Defendant's request

12   that the invocation of the Rule include or exclude experts?

13            MR. GILLAM:  Your Honor, we ask that it exclude

14   experts so that they can remain in the courtroom.

15            THE COURT:  All right.  Additionally, Mr. Gillam,

16   you and Mr. Dacus mentioned to me this morning that there might

17   be some agreement between the parties as to other witnesses who

18   would be excluded from the Rule.  Is there something you want

19   to present at this time?

20            MR. GILLAM:  Yes, Your Honor.

21            On behalf of HTC America, we would like to exclude

22   from the Rule Mr. Vince Lam and Mr. Owais Siddiqui, who are

23   both in the courtroom here, in-house counsel for HTCA.

24            THE COURT:  Does Plaintiff have objection to that

25   request?
```

```
1              MR. DACUS:  We do not, Your Honor.

2              THE COURT:  Are there additional persons Plaintiff

3    has an agreement with Defendant on to exclude from the Rule?

4              MR. DACUS:  There is, Your Honor.  Mr. Mike Carper

5    from MTel, and that's the only one.

6              THE COURT:  All right.  Am I correct, counsel, that

7    both Plaintiff and Defendants have agreed that other than

8    invoking the Rule and excluding experts, that Mr. Lam,

9    Mr. Siddiqui, and Mr. Carper would otherwise be excluded from

10   the Rule and permitted to remain in court?

11             MR. GILLAM:  Yes, Your Honor.

12             MR. DACUS:  Yes, Your Honor.

13             THE COURT:  All right.  The Rule has been invoked

14   with those clarifications.

15             If you are a witness in this case and you are not

16   designated corporate representative at the counsel table, you

17   are not a designated expert witness to appear in this case, and

18   you are not Mr. Lam, Mr. Siddiqui, or Mr. Carper, then you

19   should excuse yourselves and remain outside the courtroom until

20   such time as you're called to testify.

21             So if you're a witness and not one of these specified

22   individuals or an expert witness, you should excuse

23   yourselves -- or a corporate representative.

24             All right.  The Rule has been invoked.

25             Plaintiff, call your first witness.
```

```
 1            MR. SCARDINO:  Your Honor, it's Mr. Hays who just
 2   walked out of the room.  So we'll go get him.
 3            THE COURT:  He didn't get far.
 4            (Pause in proceedings.)
 5            THE COURT:  If you'll come forward, sir, and have a
 6   seat on the witness stand.
 7            MR. SCARDINO:  Your Honor, if I may approach, I do
 8   have some exhibit binders.
 9            THE COURT:  You may approach.
10            All right.  Counsel, you may proceed.
11            MR. SCARDINO:  Thank you, Your Honor.
12         BILL HAYS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
13                      DIRECT EXAMINATION
14   BY MR. SCARDINO:
15   Q    Good afternoon, Mr. Hays.
16            MR. SCARDINO:  For the benefit of the jury, since I
17   haven't introduced myself to them yet, my name is Daniel
18   Scardino.  I'm an attorney representing MTel, and I'm from
19   Austin.
20   Q    (By Mr. Scardino) Mr. Hays, can you please introduce
21   yourself to the jury?
22   A    Yes.  Good afternoon.  My name, of course, is Bill Hays,
23   and I'm here to represent MTel as a witness.  And I'm from
24   Jackson, Mississippi, about four hours east of here on
25   Interstate 20.  I've lived there for -- since 1975.  I'm
```

```
 1   married and have three grown children.
 2   Q     Did you drive in for the trial, sir?
 3   A     Yes.  I drove the Interstate from Jackson to here.
 4   Q     How long is that drive?
 5   A     It's about four hours.
 6   Q     Okay.  Now, can you tell the jury a little bit about your
 7   educational background and your early professional experience?
 8   A     Well, I graduated from the University of Virginia with
 9   electrical engineering.
10   Q     Tell the jury -- just let me pause right there.  Tell the
11   jury what an electrical engineering degree is.
12   A     Well, an electrical engineering degree is -- is a
13   preparation for working in the engineering field involving
14   planning, designing, implementing, testing, all these kind of
15   things that you do when you get out and do things like create
16   networks.  So that was the preparation for that.
17   Q     So what did you do after you graduated from the University
18   of Virginia?
19   A     Well, I entered the United States Air Force for four
20   years, stationed at Eglin Air Force Base in Florida.  I was a
21   technical officer, engineering officer.
22   Q     And after you left the Air Force, how did you begin your
23   professional career?
24   A     Well, after I left the Air Force, I went to work in -- in
25   Texas -- in Greenville, Texas, which is about 60 miles north of
```

```
 1   here.  And I worked with LTV Electro Systems, which has got

 2   different names now, but that's what it was back then.  And it

 3   was the electric -- electronic reconnaissance business.

 4   Q    So did that involve your electrical engineering degree

 5   that you earned in school?

 6   A    Oh, yes.  It was a -- it was a technical field, and we had

 7   lots of innovations to -- to do that work.

 8   Q    So we know from the opening statements that at some point

 9   in time later, you went to work for a company called MTel.  Can

10   you tell the jury how you got involved working for MTel?

11   A    Well, I first moved back to Mississippi.  And after that

12   move, I began to become engaged with a company called MCCA,

13   which was the forerunner of MTel.

14   Q    What did MCCA stand for?

15   A    It was Mobile Communications Corporation of America.

16   Q    Okay.  And you said it was the forerunner to MTel.  Was

17   MTel known by different names over time?

18   A    Well, yes.  The MTel name was the parent company, and it

19   had several operating companies, including SkyTel.  SkyTel

20   eventually became synonymous with MTel.  And finally we just

21   dropped MTel altogether when we talked about it, and SkyTel

22   became the predominant company.

23   Q    So when we're talking today about MTel or MCCA or SkyTel,

24   that's all the same company that -- that you worked for over a

25   period of time?
```

```
 1    A    Yes, it's -- it's the same company.
 2    Q    Is it okay with you if I just refer to -- to that as MTel
 3    and we'll use that name to refer to the company that you worked
 4    for during the entire period of time you worked there?
 5    A    Yes.
 6    Q    Okay.  So tell us a little bit more about MTel.  What kind
 7    of company was it?  What was the business that -- that it was
 8    engaged in?
 9    A    Well, eventually, it was a one-way radio paging company.
10    It had operations in several states, but these were all local
11    networks.  When I came onboard, I was assigned -- my first task
12    was to work and propose this nationwide paging network.
13    Q    So that was the one-way paging network?
14    A    That was a one-way nationwide paging network.
15    Q    And when was that?  When were you working on the one-way
16    paging network?
17    A    When I went to work there, it was in 1982.  And by 1987,
18    we had the network up and running.  And also during that
19    period, we had to apply and obtain a license from the FCC to
20    operate in that frequency.
21    Q    Okay.  Now, why do you have to get a license from the FCC
22    as you were describing?
23    A    Well, radio spectrum is a scarce commodity.  It's owned by
24    the people.  The government commissions the use of it and the
25    sound of it.  So they, of course, were in the driver's seat to
```

1    apply for the license and -- and to watch over us as we built

2    the system and operated the system.

3    Q    So is a license kind of like approval from the government?

4    A    The license is a license to operate.  So in that sense,

5    it's an approval.

6    Q    Okay.  Thank you.

7         Now, you said the one-way paging network went live in,

8    what, the late '80s?

9    A    1987 was the date that we built our initial 16 stations,

10   which was part of the license we had.

11   Q    What was your job title at MTel at that time?

12   A    Okay.  I started as a manager of special projects by -- by

13   the 1982 -- or 1987 launch.  I was vice president of emerging

14   technologies.

15   Q    Okay.  Well, let's talk about that.  What does "emerging

16   technologies" mean?

17   A    Well, that's a name that we gave in regards to doing

18   things, thinking out of the box, coming up with innovative

19   unique solutions for our company to maintain its competitive

20   lead in the marketplace.

21   Q    So what did you do with those innovative solutions that

22   you came up with at the company?

23   A    We looked at those solutions, and we saw value in the fact

24   that we had created something new and different, so we turned

25   to the patent process to protect those inventions.

```
 1   Q    Okay.  And are you, in fact, an inventor on the patents?
 2   A    I'm named on several of the patents that were filed.  And
 3   there were others as well, so I was in a collaborative effort.
 4   I was part of the teams that developed these patents, yes.
 5   Q    Right.  About how many patents are you the inventor on?
 6   A    Approximately 20.
 7   Q    Okay.  And you're one of the inventors on the patent in
 8   this case; is that correct?
 9   A    Yes.
10   Q    Okay.  Well, let's -- first, before we get into some more
11   details about your history with MTel, let's talk about what
12   you're here today to tell the jury.
13        Do you understand what you're here to talk about today and
14   the information you're -- you're here to give to the jury?
15   A    Well, I understand I'm here to talk about the facts
16   surrounding the development of the patents in -- in the case,
17   the '946 patent, in particular, and to give background and
18   information and basically what we were trying to do, what we
19   were trying to achieve during that time.
20   Q    Do you understand what you're not here to talk about
21   today?
22   A    Well, yeah, I'm not -- I'm not here today to talk about
23   the claims or -- or the legal language involving the patents.
24   I'm not a legal expert, so I don't do that or can't do that.
25   Q    Have you been --
```

```
 1   A    I'm not a technical expert.

 2   Q    I'm sorry.  Go ahead.

 3   A    And I'm also not a technical expert.

 4   Q    Okay.  So let's talk about that.  You have not been

 5   engaged as an expert witness in this case, even though you're

 6   the inventor?

 7   A    That is correct.

 8   Q    Now, why is that?

 9   A    Well, because I am an inventor.  And to come here as a

10   technical witness, I would have a conflict of interest in the

11   proceedings.  So, therefore, I'm not allowed to do that.

12   Q    And why would you have a conflict of interest, as you say?

13   A    Because I have a special interest in the -- in the patent.

14   I -- since I was one of the named inventors, I'm certainly

15   enthusiastic about the work that was done.  And I don't want

16   that to cloud judgment, and so that would be -- that would be

17   the reason.

18   Q    So you're not here today to tell the jury about the issues

19   that were mentioned in opening, infringement, validity, what

20   the claims mean, that kind of stuff?

21   A    That's correct.

22   Q    Okay.  Let's talk a little bit about the -- your history

23   with the company and the environment that you were in when

24   these technologies were developed.

25        Going back in time, tell the jury what your role was after
```

1    the one-way network was launched kind of leading up into the

2    1990s.  Let's cover that time period.

3    A    Okay.  After we had launched the one-way network in '87,

4    we began to look to new arrivings.  And our chief executive

5    officer, John Palmer, was very visionary, and he wanted us to

6    build a two-way nationwide network paging network.  That had

7    never been done before.

8         And so we set about doing that.  And that involved doing

9    proposed rule-making and participating in that exercise to

10   present our -- our proposed solution for that program.

11   Q    Who did you present that proposed solution to?

12   A    It was to the FCC in response to their -- their document

13   that came out called the proposed rule-making Narrowband Radio

14   Personal Communications Services.

15   Q    So FCC, just so -- make sure we're all following the

16   acronyms because I know sometimes technical folks can throw out

17   acronyms.  That's the Federal Communications Commission?

18   A    That's correct.  It's Federal Communications Commission.

19   Q    And that's who you were mentioning earlier licensing the

20   spectrum?

21   A    They were the licensing entity, right.

22   Q    Now, let's talk about the licenses of those proposals to

23   the FCC.  Can you give us a -- some time frame?  When did --

24   when did that occur?

25   A    Well, it occurred, of course, after the -- after the

```
 1   launch of one-way, so about 19- -- let's see -- 1989 or so.  We
 2   were busily working on a proposed solution for that and running
 3   tests.  And we did a -- work and achieved what they call a
 4   Pioneer's Preference for -- for doing this license.
 5        In other words, the Pioneer Preference holder would be
 6   granted a license at the end of this if he -- if he had that --
 7   that grant.  So our company was the only one that received the
 8   Pioneer's Preference grant.
 9   Q    So let's bring up one of the slides from the opening
10   presentation that the jury saw.
11             MR. SCARDINO:  It's Slide No. 9 from the opening
12   slide deck.  Can we bring that up, please?
13             There we go.
14   Q    (By Mr. Scardino) So you saw this slide during opening,
15   sir?
16   A    Yes.
17   Q    Okay.  And this is some language from the Pioneer
18   Preference grant.
19        Do you remember this?
20   A    Yes.
21   Q    Okay.  And it says here, the underlined portion -- and
22   I'll just read it -- Under the Pioneer's Preference rules, a
23   necessary condition for the grant of a preference was that the
24   applicant demonstrate that it had developed the capabilities or
25   possibilities of a new service --
```

```
 1              THE COURT:  Slow down, Counsel.
 2              MR. SCARDINO:  I'm sorry, Your Honor.  Thank you.
 3              THE COURT:  You're reading awfully fast.
 4              MR. SCARDINO:  I'm sorry.
 5    Q    (By Mr. Scardino) -- Demonstrate that it had developed the
 6    capabilities or possibilities of a new service or technology.
 7              Is that why MTel received the Pioneer Preference.
 8    A    That's a really good statement because that's exactly what
 9    we did, yes.
10    Q    Okay.  Now, tell us some more about the development of --
11    of the two-way network.  Did you do it all yourself?
12    A    Oh, no.  It was a collaborative effort.
13    Q    And how did it come about?
14    A    We approached it by finding an off-site place to do our
15    work.  Our chief -- I mentioned John Palmer -- had a lake
16    house.  And we'd go out there, and several of us would go there
17    with chalkboards and slides and view graphs and everything else
18    and things to record and document solutions to the problems
19    that we saw would exist in a -- in a two-way network.
20        So as a result of that effort, we had enough information
21    before us to realize we could actually build this network and
22    make it work.
23    Q    And we saw that you got the Pioneer Preference.
24              MR. SCARDINO:  Let's pull up another demonstrative.
25    This is No. 3.
```

```
1            And if you can go to the --
2   Q    (By Mr. Scardino) So this is a Federal Communications
    Commission record.  And you see there it talks about Narrowband
4   Personal Communications Service, memorandum opinion, and order.
5       Do you see that, Mr. Hays?
6   A    Yes, I see that.
7   Q    So tell the jury a little bit about that.  You mentioned
8   this term before, "Narrowband Personal Communications
9   Services."  What -- orient us to that term.
10  A    Well, the FCC wanted to allocate some special -- it would
11  be a nationwide service.  It would provide a variety of
12  services within that resource.  This is sort of like a green
13  approach to like radio communications.
14      Like -- like when I stay in the hotel, they said, if you
15  want -- if you want us to wash your towels, you know, we'll do
16  it; but if you -- if you don't want us to wash them, you know,
17  throw them on the floor, and we'll wash them for you (sic).
18      We were all encouraged to serve.  We may think we have
19  plenty of them, but over time we found out these are scarce.
20  And so these techniques we developed would be applied to
21  anything, whether it's broadband or narrowband, to conserve
22  spectrum, which is very important.
23          MR. SCARDINO:  Okay.  Now, let's turn back to that
24  demonstrative.  And there's a page that we've highlighted
25  there.  Can we get it up?  It's not a --
```

```
 1              Your Honor, may I approach to grab a binder, and then

 2    I'll --

 3              THE COURT:  You may.

 4              MR. SCARDINO:  Okay.  Are you able to pull it up?

 5    It's Page 7.

 6              I apologize for the technical difficulties.

 7    Q    (By Mr. Scardino) So, again, we'll get there, but this

 8    is the -- maybe I should just -- oh, here we go.

 9         So this is the same document, the memorandum and order

10    from the FCC.  And what we've got highlighted on the screen

11    here is a statement that the FCC made about MTel's Pioneer

12    Preference Award.

13         Can you read that, sir, please?

14    A    This is MTel's Pioneer's Preference.

15         MTel was awarded a Pioneer's Preference for having

16    developed and demonstrated the feasibility of significant

17    innovations that will permit delivery of existing and new

18    advanced paging and messaging services in a spectrum-efficient

19    manner.

20    Q    So this says new advanced paging and -- and messaging

21    services.  Can you help us understand what that means?

22    A    What they're trying to emphasize is they didn't want to

23    have a rollout of something that was -- that was existing and

24    commonplace.  They wanted this thing to advance beyond where we

25    were, including nationwide coverage, including providing
```

1    innovative services like stock paging and just messaging to

2    people, two-way messaging among people --

3    Q    Okay.

4    A    -- all kinds of things that were new.

5    Q    So moving beyond what you were doing with the one-way

6    paging --

7    A    Moving beyond.

8    Q    -- would that be fair?

9         Okay.  Let's -- let's talk about this last group of words,

10   "spectrum-efficient manner."  Help the jury with what

11   spectrum-efficient means for you at -- what it meant for you

12   back at MTel.

13   A    Right.  Well, these -- these channels we got from the FCC,

14   the frequencies we get, the spectrum we get are kind of like

15   the interstate highways, you know.

16        So when I go back to Jackson, I'm acutely aware of the

17   fact that I'm glad those -- those roads are open.  They're

18   four-lane roads.  But when they're under construction, they're

19   narrow, right, and -- so it increased congestion.

20        So we had to operate in a -- in a manner in which we can

21   utilize maximum use of the infrastructure, maximum use of the

22   road, but in this case, maximum use of the spectrum that we're

23   assigned.

24   Q    So spectrum efficient, getting an award for being spectrum

25   efficient means you designed that really well; would that be

1  fair?

2  A    Yes.

3  Q    Okay.  Let's talk about -- to your knowledge, sir, how

4  many other two-way wireless nationwide networks existed in the

5  marketplace back when you were getting awarded this Pioneer

6  Preference?

7  A    Well, following the FCC's definition and requirements that

8  they put out when they did this rule-making, we were the first

9  ones to do this.

10       So these were non-existing.  Otherwise, they wouldn't have

11  the proceedings.  So we were the first ones to fulfill that.

12  We built our network before anybody else.

13  Q    Okay.  So let's talk about some of the differences between

14  one-way paging and the two-way network that you were working

15  on.  Can you give the jury a sense of what were the different

16  capabilities between those two types of networks?

17  A    It's hard to imagine the limitations of one-way paging

18  back then, but back then you could only send a message from you

19  to the recipient and hope that he got it.

20       With two-way messaging, we changed all that.  And for

21  now -- for the first time we were able to send a message to

22  someone, and they could -- they could take their mobile device

23  and then answer back to the person that sent it.  So it was

24  a -- it was a messaging system that would support

25  communications in both directions.

1    Q    Okay.  And let's look at PX-46.

2         MR. SCARDINO:  If you could call that up.

3    Q    (By Mr. Scardino) Mr. Hays, have you seen this document

4    before?

5    A    Yes.  This is a high-level description document dated

6    1999, and this is -- it's Revision 2.2.

7    Q    So what does that tell you, Revision 2.2?

8    A    Well, it meant that there were two -- two revisions before

9    this one.  So this was an ongoing document to keep updated what

10   the system was about and have a high-level description in front

11   of people to refer to.

12   Q    Okay.  And we -- we heard the word -- the name SkyTel

13   before.  That was the -- the -- tell -- tell the jury, again,

14   what was SkyTel in relation to your company, MTel?

15   A    So SkyTel was really the brand name for our product and

16   services, so it was finally adopted as the name of the company

17   that provided these products and services.

18   Q    Okay.  Now, why don't we turn to Page -- I believe it's

19   Page 7 of this document.  And I want to talk about the types of

20   messages that could be sent --

21        MR. SCARDINO:  I'm sorry.  Let's go back first to the

22   overview on Page 3.

23   Q    (By Mr. Scardino) I want to talk about the types of

24   messages that could be sent in the SkyTel network.

25        THE COURT:  Counsel, approach the bench, please.

```
 1              MR. SCARDINO:  Yes, Your Honor.

 2              (Bench conference.)

 3              THE COURT:  Mr. Scardino, your examination is replete

 4     with statements.  Let's talk about this.  I'd like to discuss

 5     that.  Let's talk about the differences between one-way paging

 6     and the two-way network.  These are not questions.  These are

 7     all sidebar comments trying to communicate to the jury

 8     topically where you want to go next.  You need to confine your

 9     examination to questions to the witness in question form that

10     he can answer.

11              MR. SCARDINO:  Of course.

12              THE COURT:  Understood?

13              MR. SCARDINO:  Yes, sir.

14              THE COURT:  Let's proceed.

15              (Bench conference concluded.)

16              THE COURT:  All right.  Let's proceed.

17              MR. SCARDINO:  Thank you, Your Honor.

18     Q    (By Mr. Scardino) Mr. Hays, what's highlighted here?

19     A    Well, the first highlight is SkyTel's two-way advanced

20     messaging system, AMS.

21     Q    Can you describe what that is to the jury?

22     A    Well, AMS is the name that we gave to the -- to the system

23     that we created to do the two-way paging network.

24     Q    And a few paragraphs down below there, the second

25     highlighting, can you read that, please?
```

1  A    Okay.  So supported message types include numeric,

2  alphanumeric, voicemail, email, and binary.

3  Q    Can you explain for the jury what each of those message

4  types are, starting with numeric?

5  A    Numeric was very common to radio paging.  It's a way of

6  saying a telephone number to -- to another user so they can

7  either call you back or for other reasons.

8        Alphanumeric means they can send a text message --

9  alphanumeric text message to a -- to a user.  So that's common

10  today in other services, as well.

11        Voicemail, if you've got voicemail, it would be

12  deposited in the -- in the control center and the notification

13  would go out and you can call your message back by -- by

14  contacting the center and retrieving the message.

15        Email, it was just a term that was more electronic

16  mail back then than the term "email" was used, but it's

17  electronic mail common to what we have today where you can send

18  somebody an email message.

19        And then the binary is the -- is the type of

20  messaging that allows you to do things like pictures or a

21  facsimile or -- or data spread out over a -- a graphics image.

22  So for that, you need binary.

23  Q    Could all of these message types be transmitted in the

24  SkyTel network?

25  A    Yes.  All of these were supported message types, as it --

```
 1   as it states here.
 2   Q    Now, let's turn to Page 9 of this document, please.  First
 3   I want to look at the Section 2.2.1.1.
 4        Mr. Hays, do you see that section?
 5   A    Yes.
 6   Q    Okay.  Can you describe for the jury what this document is
 7   saying about information services, please?
 8   A    Okay.  So -- so what are information services?  And it
 9   answers that by saying these are news, stock quotes, weather,
10   and sports would be examples of information services that would
11   go to a subscriber's mobile unit and be displayed to them.
12        And it goes to an example of saying -- they're saying
13   MSNBC Sky News, for example, you can update that twice a day to
14   every subscriber as part of the basic subscription package.
15   Q    And so were all of these types of messages?
16   A    These were the type -- types of messages.  And this is a
17   type that would be either numeric or -- I mean, alphanumeric
18   probably, or it could be some type of message that could be
19   incorporated in a smart pager.
20   Q    Well, we'll come back to that -- that term.  Let's go down
21   to Section 2.2.1.2.  Describe for the jury, please, what
22   this -- this section is relaying, please.
23   A    Okay.  This is talking about transaction services.  So if
24   you transact business with a bank -- for example, so you
25   have -- examples of transaction services are banking, travel
```

1    arrangements, shopping, credit card verification, and

2    agent-based transactions.

3    Q    So are these all things that you could do in the SkyTel

4    two-way network?

5    A    Oh, yeah, these were all supported.

6    Q    Now, did MTel ever actually launch this two-way network?

7    A    Oh, yes.  Yeah.

8    Q    When was that?

9    A    That was in 1990 -- '93 -- or I'm sorry -- 1995.

10   Q    Now, 1993, I think, we were looking at the Pioneer's

11   Preference?

12   A    Oh, yeah, the Pioneer's Preference was 1993.  In 1995, we

13   had the -- had the launch.

14   Q    All right.  Well, tell the jury a little bit about the

15   launch and -- and the history surrounding that, please.

16   A    Well, that was an exciting time for the company because

17   the team had succeeded in putting this network together, and so

18   we had a public announcement, and we all converged on New York

19   City to the -- to New York Public Library, and we demonstrated

20   to the -- to the investors and to the public how this thing

21   worked and -- and showed that this system was -- was ready to

22   begin services.

23   Q    Okay.  So we've heard a term, "paging."  What is the

24   difference between paging and -- and messaging?

25   A    Well, paging is -- is messaging.  I mean, we send the

1  messages over paging.  So we use the term "paging" because it's

2  a legacy term.  But the reality of it is, it's really a

3  messaging system that we use to transmit information back and

4  forth among users.

5  Q    Now, how would messages that were transmitted through the

6  network find their way to their -- to the appropriate

7  recipient?

8  A    Well, we made it easy on people.  We -- we assigned them a

9  10-digit PIN number, which is a -- a personal identification

10  number.  This way you don't have to remember a number that --

11  that can support a million different addresses for your unit.

12      So our network operating system, we matched that up with

13  the correct thing to send over the network.  So each -- each

14  user had a PIN number.  And if you -- if you addressed them,

15  you could use an email type address like PIN number @skytel.com

16  would be one way to do that.

17  Q    And so you would use these PIN numbers to send all types

18  of messages through the network?

19  A    Yes.

20  Q    Let's talk -- let me ask you about -- what is a smart

21  pager?

22  A    Well, a smart pager came along as a result of these

23  demands for -- for advanced services.  It allows a user, a

24  company or whoever, to program the pager so it does things with

25  the data that -- that might not be so obvious.

```
 1       Like, for example, you could have a -- you could have a
 2  spreadsheet, and then data could be sent to just update
 3  particular blocks on this spreadsheet that showed changes,
 4  like, for example, you could represent prices for -- for
 5  traveling salespeople.  Some of those could represent
 6  quotations for stocks and those kinds of things.
 7  Q    I think we have a demonstrative of one of the smart
 8  pagers.
 9       Here it is on the screen.  Tell the jury about this
10  demonstrative, please.
11  A    Well, this -- this is a Motorola product.  It's called a
12  PageWriter 2000.  And as you can see, it has a nice little
13  keyboard, which we all miss that today.  Everybody wants a
14  keyboard.  And there were -- as you see on the screen, it had a
15  way you could just select read, and you could read your -- your
16  email, or kind of have a -- you could write, and you could
17  write an email to be somebody and send it.
18       And then it had an address book, so you didn't have to
19  remember your PINs for everybody.  You could -- you could
20  record that in your address book.  And that's the way you could
21  address the message.
22  Q    Were there other types of devices, other than smart
23  pagers, that worked on the SkyTel network?
24  A    Well, there were because it was a big -- it was a big
25  difference in the -- in the consumer marketplace.  Some people
```

1   wanted very simple units.  Some people wanted -- wanted to go

2   to the added complexity and expense of a smartphone -- or a

3   smart pager.

4       And so we had those provisions.  And so our manufacturers

5   would -- would come up with different types of products for

6   different levels of usage.

7   Q    And did all the different devices have the same features?

8   A    No.  They had -- they had different features.  And some of

9   these were limitations of features.  Others were -- were type

10  of features.  Like, you know, we mentioned binary transmission.

11  Well, not all pagers could accept binary, but most of them

12  could.

13      But the NOC, in the brains of the unit, in the format of

14  the unit in the NOC, we knew the makeup of the recipient's

15  device so we could -- we could tailor the transmission to work

16  with that unit.

17  Q    So what is the -- what is an NOC?

18  A    An NOC is a -- is the Nationwide Operation Center, so it's

19  the brains of the network.

20  Q    And tell the jury a little bit, please, about how the NOC

21  would operate what its functionalities were.

22  A    Okay.  The NOC was -- originally, we had only one NOC, and

23  that was in Washington D.C.  And then we expanded by having

24  backup to that NOC, so we had -- we had duplicate databases in

25  Washington, Jackson, Mississippi, and eventually Dallas, Texas.

1      So we eventually had three centers, but they all did the

2   same thing, and they had the same data.  So if one went down,

3   the network would continue to operate.

4      The function of this NOC was to be a repository for the --

5   for the subscribers's records arranged by the PIN number so

6   that we knew what devices they had, what they were entitled to

7   do.  You know, if they could do these different services, we

8   had limitations for that.

9      We authorized that, and we would use that to collect

10  billing information, which we transferred to our billing

11  system.  So we had a very flexible network operations created

12  through the NOC.

13  Q    Was the NOC involved in sending messages to pagers in

14  mobile units?

15  A    Yes.  It was the -- it was like the place where the

16  message ended up before it's -- it's sent on to the end user.

17  It's -- it's -- the message came, and they were stored in the

18  NOC and actually sent to the -- to the end user.  You could go

19  back later on and -- and in -- in using a terminal contact the

20  NOC and download those messages if you wanted to, for example.

21  Q    Let's -- let me ask you about pagers.  Could all the

22  different types of devices receive the same types of messages?

23  A    The types of messages are varied from the quality and the

24  expense of the unit.  So not all units could receive the same

25  messages as each other.  I mean, we could have a unit as simple

```
 1   as just -- simple -- simply a tone-only notification.  We
 2   didn't have any of those, but you could.
 3        We had numeric types that could be -- people could send
 4   you that from a telephone, touchtone telephone.  And others
 5   would have the full -- the full menu, the alphanumeric, and
 6   binary, and so forth.
 7   Q    All the way up to the -- including the smart pager that we
 8   see on the screen?
 9   A    Right.  So -- yeah, so we had different levels we provided
10   for that service.
11   Q    Could the devices all receive the same length messages?
12             MR. SELINGER:  Your Honor, objection.  It's not clear
13   what time we're talking about, what time frame.
14             THE COURT:  Overruled.
15   A    So would you repeat that, please?
16   Q    (By Mr. Scardino) Sure.
17        Could all the different devices that operated on the
18   SkyTel network receive the same length messages?
19   A    No.  There were some differences in the message lengths.
20   They could receive -- some of them could receive 10,000
21   character messages.  There was some specialized products --
22   products that could actually go up to 40,000 characters for a
23   message, for a single -- single send operation.
24   Q    What is a character?
25   A    Well, a character is the -- is the payload for the
```

1   messages sent to the pager.  Usually, it's -- it's like a

2   binary coded character, like a letter a number.  Or in the case

3   of binary, it could be -- it could be a collection of bits, and

4   so you could say it could be a certain binary length.

5   Q    So if -- if there were different length messages, would

6   that be a different number of bits?

7   A    Yeah.  The messages transported through the packets in

8   this network.  And if you had more packets, you could convey

9   more messages.  So some pagers could -- could actually, you

10  know, accept and receive longer messages than others.

11  Q    So how would the network handle sending different length

12  messages to the different units?

13  A    Well, the -- the over-the-air messaging protocol was

14  arranged so it would -- it would tell the unit what's coming

15  over and how long this is going to be.  And it would -- it

16  would -- it would -- it would measure out the correct flow so

17  you wouldn't overwhelm the recipient's device.  And you could

18  keep the network going that way.

19  Q    So that's -- that's getting to my next question, which is,

20  what would happen in the SkyTel network if a device couldn't

21  handle a message because it was too large or too big?

22  A    Well, one -- one thing that we could do is take advantage

23  of this sending again function where, if you have a short

24  message going to a pager that could only accept a short

25  message, but you have a longer message in mind, you could send

1    the message like, it's a longer message, but only the first

2    part would get through, and then they could press the button

3    and have the rest of the message sent.

4        So you could get this in -- in different installments and

5    displayed to the user.

6    Q    Now --

7            THE COURT:  Let me interrupt just a minute.

8            Ladies and gentlemen, I think this is probably as

9    good as any place for us to take a recess.  You've been back in

10   the courtroom almost two hours.

11           I'm going to allow you to retire to the jury room and

12   recess for a break at this time.  You may just close and leave

13   your notebooks in your chairs, if you'd like.

14           Don't discuss the case or anything about it.  Take

15   this opportunity to stretch your legs, get a drink of water,

16   and we'll be back in here and continue with this witness in a

17   little bit.

18           The jury is excused for recess at this time.

19           COURT SECURITY OFFICER:  All rise for the jury.

20           (Jury out.)

21           THE COURT:  Be seated, please.

22           Mr. Hays, you are going to have to speak up.  You are

23   mumbling over there.  I'm 3 feet away from you, and I'm having

24   a hard time hearing what you're saying.  I have real concerns

25   how much of this the jury is or isn't getting.

```
 1              I love a southern drawl as much as anybody, and I
 2    grew up 30 miles south of Alabama, I'm used to it, but some of
 3    these jurors probably are not.  And so you're going to have to
 4    slow down, and you're going to have to speak distinctly.  And
 5    you're going to have to speak loud enough where everybody can
 6    hear you.
 7              Will you work on that for me, please?
 8              THE WITNESS:  Yes, sir.
 9              THE COURT:  Okay.  We're going to take a recess,
10    counsel.  Take about five minutes and then meet me in chambers,
11    and we'll take up some of the remaining matters that we need to
12    go over.
13              Court stands in recess.
14              COURT SECURITY OFFICER:  All rise.
15              (Recess.)
16              (Jury out.)
17              COURT SECURITY OFFICER:  All rise.
18              THE COURT:  Be seated, please.
19              All right.  Mr. Hays, you may return to the witness
20    stand.
21              And I think, sir, if you will turn your head toward
22    the jury, it will put you in line with the microphone and that
23    will help with the volume, perhaps with everybody's ability to
24    understand what you have to say.
25              THE WITNESS:  Thanks.
```

```
 1              THE COURT:  All right.  You may return to the podium,
 2    Mr. Scardino.
 3              MR. SCARDINO:  And, Your Honor, may I ask one
 4    question?
 5              THE COURT:  You may.
 6              MR. SCARDINO:  I was going to use the flip board to
 7    do a drawing, but I've got a concern with doing it here.  The
 8    jury may not be able to see it over the podium.
 9              THE COURT:  No.  You can move it, but you'll probably
10    have to prove it around this way (indicating) --
11              MR. SCARDINO:  Okay.
12              THE COURT:  -- if there's room.
13              MR. SCARDINO:  Thank you.
14              THE COURT:  Are you going to do it as soon as they
15    come back in?
16              MR. SCARDINO:  Yes, sir.
17              THE COURT:  Okay.  Go ahead and preposition it.
18              And, Mr. Selinger, you are free to move in the
19    courtroom where you need to see whatever he's going to write on
20    the board.
21              MR. SCARDINO:  Thank you, Your Honor.
22              THE COURT:  Once you pass the witness, you and
23    Mr. Selinger need to determine if he's going to use the same
24    chart on cross.  If so, you can leave it; if not, you need to
25    move it back where it came from.
```

```
 1            MR. SCARDINO:  Yes, Your Honor.
 2            THE COURT:  And next time we have a conference in
 3   chambers, Mr. Scardino, I expect to see you in the room.
 4            MR. SCARDINO:  Yes, Your Honor, of course.
 5            THE COURT:  You were the only one not there.
 6            MR. SCARDINO:  I'm sorry.
 7            THE COURT:  All right.  Mr. Floyd, let's bring in the
 8   jury.
 9            COURT SECURITY OFFICER:  All rise for the jury.
10            (Jury in.)
11            THE COURT:  Please be seated.
12            All right.  Counsel, you may continue with your
13   direct examination of the witness.
14            MR. SCARDINO:  Thank you, Your Honor.
15   Q   (By Mr. Scardino) Mr. Hays, before the break, we were
16   talking about what would happen in the SkyTel network if a
17   device couldn't handle a message because it was too big.  I'd
18   like to illustrate the example that you were just discussing
19   for the jury.
20       So can you give us an example of -- of that, again, and
21   I'll draw while you talk.
22   A   Okay.  Great.
23            THE WITNESS:  Is this better, by the way, for the
24   jury?
25            THE COURT:  Don't ask the jury a question.  You can
```

```
 1   ask me.  And, yes, it's better.
 2            THE WITNESS:  Okay.  That's better.  Okay.  Thank you
 3   very much.
 4   A    Okay.  So the example we're talking about is a message
 5   that's too long for the pager to receive.
 6   Q    (By Mr. Scardino) And so, Mr. Hays, why don't we start
 7   with this.
 8   A    Okay.
 9   Q    I'm going to have two devices.  So let's call one of those
10   Bob's device and the other one Alice's device, okay?
11   A    Okay.
12   Q    Now, the assumption is those are two different devices
13   with different capabilities.  So walk us through the example,
14   please.
15   A    Okay.  So Bob's going to send a message to Alice.  And
16   these are two different devices with two different
17   message-handling capabilities.
18        So what does the NOC do when a message comes in to Alice
19   from Bob, but the message is too long for Alice to read on her
20   unit.
21   Q    And in this example, how long are we going to have the
22   message be?
23   A    5,000 characters.
24   Q    Okay.  Okay.
25   A    But Alice's unit can only handle 2500 characters.
```

1    Q    Okay.  So how would the NOC deal with that problem?

2    A    Well, several ways.  One is they can just send that

3    message over to Alice, which will result in some sort of error

4    that Alice can then press a button and have the rest of the

5    message sent to her --

6    Q    Okay.

7    A    -- on a separate sending.  And that's probably the most

8    straightforward way to handle it.

9    Q    Okay.  And then are there other ways that would handle it?

10   A    Well, there are other ways you can handle it by -- by

11   simply handling the NOC, break that message into two

12   2500-character transmissions, separate transmissions.

13   Q    Okay.  So let me draw -- I'll put 2500 over here, and --

14   and so what would happen in that scenario?

15   A    Well, in that scenario, there was a protocol that the NOC

16   would follow that would tag that first message so that the

17   second message would know that it's the second message.  And so

18   when the device gets the two messages, it can reassemble them

19   into one 5,000-character message.

20   Q    So is that a pretty accurate drawing of what you're

21   describing there?

22   A    Yes.

23   Q    Okay.  So in this scenario where it's breaking up the

24   message into 2500 characters, two -- two parts, how would

25   the -- how would the network know how to get both of those

```
 1   parts to the -- to the mobile unit in the network?
 2   A    Well, first of all, as we mentioned earlier, the NOC has a
 3   directory that shows what kind of unit that Alice has.  So when
 4   this 5,000-character message comes into the NOC, it knows that
 5   it can't simply send in a 5,000-character message and have it
 6   correctly display that message.
 7        But it does know that it can break it into two parts.  And
 8   it knows how to tag the two parts so that when it arrives in
 9   the device, the device is able to reassemble it into one
10   composite message.
11   Q    So in -- in terms of how it would do that, would it use
12   the PIN that you described earlier?
13   A    The -- the message going into the NOC would be a
14   PIN-addressed message, just like any other message.
15   Q    So would each of these message parts have the PIN?
16   A    Well, actually, the -- the NOC will take care of the
17   addressing, so the addressing from the NOC to the user probably
18   won't even show the PIN.  It will just show the electronic
19   address of that device because it has -- has that cross
20   reference in the NOC database.
21   Q    And so each of the devices that operate in the network, do
22   they have their own PINs?
23   A    Yeah.  The reason for the PIN -- the separate PIN and the
24   electronic numbering system is in case your device goes out,
25   they don't have to change your PIN in order to get the passage
```

```
 1    to you.  They can just take the new device and this electronic
 2    serial number and associate that with the PIN in the directory.
 3    Q    So describe for the jury the components of a message that
 4    would come out from the NOC with the address information and
 5    the message in it and everything else, what does that -- what
 6    are the components of a message?
 7    A    Well, in this system, there are 1 billion possible
 8    addresses that the NOC can use to send a message.
 9        So to keep all that straight, when the user signs up with
10    an NOC, the NOC makes a record of the person, they have a PIN
11    number they use to enter the message, but when that message is
12    actually transmitted or sent to the user, it -- it goes into
13    the database and associates the PIN with the electronic serial
14    number, that long number that can address up to a billion
15    pagers.
16        And so that's what's actually sent out from the NOC.
17    That's how it keeps it straight.
18    Q    Okay.  And where in the message -- in the transmission,
19    what is actually sent out?
20    A    Okay.  Well, what's actually sent out -- well, there's two
21    parts of the message, right?
22        So the first part has a -- has a first block, has the
23    address of the unit --
24    Q    Okay.
25    A    -- in the first part of it.
```

```
1        And then there's a -- some payload data, we call it.  It's
2   the actual -- actually, the message text.
3        And then the -- and then there's a -- there's a block at
4   the end of this that -- that describes the functionality
5   process.
6        In other words, it would -- it would have a code in there
7   that tells them this is a two-part message, and this is the
8   first part of the two-part message.  So that -- that's how the
9   first part would go out.
10        The second part would have that tag on the end of it to
11   describe the fact it's the second part of a two-part message.
12   Q    So what should we call this third part of the message
13   block that has that information in it?
14   A    Well, it can be called the functional block.
15   Q    Okay.
16   A    So we have -- we have an address, we have the payload, and
17   the functional.
18   Q    And that will do for that?
19   A    Yes.
20             THE COURT:  Let's make sure both of you gentlemen let
21   the other one talk before you start.  The court reporter can't
22   take down two people talking at the same time.  So be mindful
23   of that.
24             MR. SCARDINO:  Thank you, Your Honor.
25             THE COURT:  Let's proceed.
```

1  Q    (By Mr. Scardino) So this -- this system of message

2  components, was that something that you invented?

3  A    This is what we collect -- collectively decided would be

4  the best way to structure the messages in the NOC.  So any one

5  person, I don't think, can take credit for that.

6  Q    Well, and --

7  A    And part of what you're doing now with the whiteboard

8  and -- and dialogue is kind of what we went through -- we

9  described it the lake house meetings early on when these kind

10  of issues came up, so yeah.

11  Q    And that was probably too broad a question.  Let me be

12  more specific.

13      Was this system of addresses and payload and functional

14  information at the end of a message, that -- that component

15  structure of a message, was that something that you knew before

16  you developed the -- the SkyTel two-way system?

17  A    I can't -- I can't recall if I knew it before then or not,

18  so...

19  Q    Okay.

20  A    It flows.  I mean, it certainly is the correct way of

21  doing it.  But I don't -- I don't remember the exact train to

22  get to that track.

23  Q    Oh, okay.

24      Well, that's -- train is an interesting analogy because I

25  was thinking this looks like train cars.

```
 1   A     It does, doesn't it?
 2            THE COURT:  All right, gentlemen.  If you want to
 3   have a discussion about train cars, do it some other time.
 4   Let's ask questions, Counsel, and let's answer them and limit
 5   the answers to the question asked.
 6            Let's proceed.
 7   Q    (By Mr. Scardino) Let's move on.
 8        So what were the -- were the two-way network technologies
 9   that you were working on at SkyTel limited to operation in this
10   Narrowband PCS spectrum?
11   A     The technologies we developed were for narrowband
12   spectrum.  The actual techniques had applications beyond the
13   narrowband spectrum because, as we mentioned earlier, spectrum
14   is scarce, and no matter whether you have broadband or
15   narrowband, you have the same eventual problem of running out
16   of spectrum.
17   Q    So in opening, the jury heard this idea of a pipe, that
18   spectrum is a pipe.  Is -- is a narrowband just a different
19   size pipe than a broadband pipe?
20   A     That's a good analogy because you obviously get more stuff
21   through a bigger pipe.
22   Q    And let's talk about -- talk about that.  In terms of
23   wireless networks and configuring and designing wireless
24   networks, how would you design a network differently for a
25   small pipe or a big pipe, if you would design it differently?
```

1          MR. SELINGER:  Objection, Your Honor.  I can't

2 tell -- I can't tell if this is a hypothetical calling for an

3 expert opinion or whether he's asking about something this

4 witness actually did.

5          THE COURT:  Restate your question, Counsel.

6          MR. SCARDINO:  Yes, Your Honor.

7 Q    (By Mr. Scardino) In the context -- in your experience,

8 sir, what you were working on at SkyTel and your other

9 experience, would you design a wireless system differently

10 based on the size of the pipe with respect to spectrum

11 efficiency?

12          MR. SELINGER:  Objection.  There's no foundation for

13 that -- no foundation that he actually did it.  It's still not

14 clear whether this is a hypothetical or whether this is what he

15 actually did.

16          THE COURT:  I'll sustain as to lack of foundation.

17 If you want to try to lay a foundation, you may do so.

18          MR. SCARDINO:  Thank you, Your Honor.

19 Q    (By Mr. Scardino) Mr. Hays, you were involved in designing

20 and deploying the SkyTel one-way wireless system?

21 A    Yes.

22 Q    Okay.  And you were also involved in designing the SkyTel

23 two-way wireless system?

24 A    Yes.

25 Q    Were -- had you been involved -- had any -- any experience

1   with any other wireless systems?

2   A    Well, I was involved when we built our first cellular

3   system in evaluating equipment and looking at network structure

4   and so forth.  I was involved with -- when we did our American

5   mobile satellite communications system, which was a broadband

6   satellite-based system that was launched.

7   Q    And so in those cellular systems and the satellite system,

8   those were not narrowband systems?

9   A    Those were broadband systems, yeah.

10  Q    So in your experience, when you're designing for spectrum

11  efficiency, narrowband or those broadband systems, do -- do you

12  do it differently?

13  A    Without the constraints of a smaller pipe, you very well

14  could start out differently.  The eventual part that you reach

15  is when you run out of capacity and you begin to look for

16  techniques to -- to get to where you need to be.  And so these

17  techniques that we developed for narrowband will apply to

18  broadband.

19  Q    So let's talk about this issue of capacity because the

20  jury's heard about that.  What is capacity in the context of

21  wireless networks?

22  A    Well, capacity -- you know, we talked about payload awhile

23  ago.  Obviously, if you've got any kind of network, a train

24  network or a highway system, you want to divide -- you want to

25  design it for maximum capacity.  That means you're going to

1   have traffic flowing to the system.  You don't want congestion.

2       For example -- a good example for that would be over in

3   Dallas, the Cowboys play, right?  So all of a sudden, at the

4   Cowboys stadium, there's a huge demand for services.  You know,

5   they've got a stadium that can seat almost 100,000 people, for

6   example.  If they all have these two-way units and they start

7   using them, all of a sudden, you've got congestion you didn't

8   have before that event.

9       So we call that the convention scenario.  And so we had to

10  design for that.

11      So that's a -- that's a reason why congestion does occur

12  on occasion.  It didn't occur all the time, but it -- but it

13  does happen.  And when it happens, you have to be able to keep

14  the system going.

15  Q   So capacity relates to the number of users that are on the

16  network?

17  A   The number of users and -- and the frequency in which they

18  send the message.  So if these are all Cowboys fans out there,

19  they're probably going to send a lot messages every time they

20  score.  So that's a -- that's a constraint because you have to

21  design across.  You have to make sure you've got the right

22  capacity to keep the system going.

23  Q   Now, could you address capacity issues on the network

24  side?

25  A   On the network side, our NOC actually measures what's

```
 1   going through it and -- and how efficiently things have been

 2   delivered.  So we get -- we get feedback from that, and we can

 3   adjust certain parameters.

 4        You know, for example, you can hold back messages, if you

 5   want to.  You can slow it down, even though -- you want every

 6   message to get through.  If they all go through at the high

 7   rate, they may -- they may congest the system to the point it

 8   can't function.

 9        So the NOC has considerable control functions to make sure

10   that doesn't happen.

11   Q    And can you also address these capacity issues in the

12   network on the -- on the mobile unit side, on the device side?

13   A    Well, yeah.

14        Some of the things we talked about is -- is trying to

15   control how many resending has to take place in the unit to get

16   the message correctly sent to a user.  And if the message is --

17   is distorted, it's got some white spots in it or characters

18   that are obviously wrong and you have to resend that, then that

19   takes capacity.

20        But sometimes what we've observed is some of those type of

21   messages can be read across and still the user can still

22   understand what's being said, like call me at a certain number.

23   If it's your number, you know what the number is.  And you may

24   not have to have that resent to you.

25        So they just don't press the button and it just --
```

```
 1    that's -- that's what's displayed.  It's a good enough message,
 2    and that's what they get.  That's good for them because it
 3    saves us capacity.
 4         But it also translates in lower cost to the user, but it
 5    also allows the user to go on about his business and not have
 6    to worry about this unit responding to -- to resend copies of
 7    messages that may cause it to, on occasion, vibrate or sound.
 8    So it's a convenience as well.
 9    Q    Now, Mr. Hays, looking at our example over here, what
10    you're describing, so you're describing that you can put a
11    feature in the mobile unit that would have the 2500-character
12    first part of the message and then let the user choose whether
13    or not to get the second part of that message?
14                MR. SELINGER:  Objection; leading.
15                THE COURT:  Sustained.
16                MR. SCARDINO:  I'll move on.
17    Q    (By Mr. Scardino) So Mr. Hays --
18                MR. SCARDINO:  Why don't we pull up PX-1.
19    Q    (By Mr. Scardino) Okay.
20                MR. SELINGER:  Your Honor, may I return, and could we
21    move the easel back, or should we wait until the end?
22                THE COURT:  No.  Let's let him pass the witness, and
23    then we'll determine whether to leave it or not.
24                Proceed, Mr. Scardino.
25                MR. SCARDINO:  Thank you, Your Honor.
```

```
 1    Q    (By Mr. Scardino) Okay.  So this is the patent that we're
 2    all here to talk about, Patent No. 5 -- 5,754,946.  What's the
 3    name on this patent?
 4    A    Nationwide Communications System.
 5    Q    Okay.  And you're one of the inventors on this patent.  Is
 6    that your name there?
 7    A    Yes, towards the bottom.
 8    Q    Okay.  William D. Hays of Jackson, Mississippi, that's
 9    you?
10    A    That's -- that's me.
11    Q    Okay.  Who are the other people that are listed on here?
12    A    Well, the first name is -- is Dennis Cameron.  He's from
13    Jackson.
14    Q    Did all of these other names -- did they all work with you
15    on this project?
16    A    Yes.
17    Q    Okay.  So this was a collaborative effort?
18    A    These are the collaborators, yes.
19    Q    Okay.  Now, let's also look at this other part that's
20    highlighted.  It says:  Assignee.  Who is the assignee there?
21    A    Mobile Telecommunication Technologies, Jackson,
22    Mississippi.
23    Q    And that's the company you work for that we've been
24    talking about today?
25    A    Yes.
```

1   Q    Okay.  Now, was this -- does this patent involve generally

2   the -- the solutions to the capacity problem that we were

3   talking about moments ago?

4   A    Yeah.  It -- it expands the current technology to -- to

5   the case where the user becomes empowered to have messages

6   approved by the -- by the sender -- I mean, by the user so that

7   they don't have to have it retransmitted in order to get the

8   correct message so that saves airtime.

9        So that was one of the features.  It's a manual type of

10  error correction system.

11  Q    Now, let's go back to when you conceived this patent.

12  What was the process at MTel to -- or was there a process at

13  MTel to convert new ideas into -- into patents?

14  A    We had a plan that evolved over time that -- that caused

15  the people who collaborated on the patent to be very formal in

16  how they filled out their ideas and forms.  They submitted

17  forms and written documentation so that the -- the patent

18  committee could look at this and decide if it's worth

19  proceeding with.

20       It was.  We would engage the patent lawyers to take a look

21  at it, and they would take it and begin to draft the patent

22  application.

23            Also, the function of the lawyers was to look at the

24  inventors and make sure we have the right inventors on the

25  patent and not have people on there that shouldn't be on there.

```
 1   But then, again, we had to exclude -- we had to include
 2   everybody that had something to do with the patent.  So those
 3   two processes were done and respected, as we continued.
 4   Q    Why was it important to MTel, your -- your employer, to
 5   capture these ideas and file patents?
 6   A    Well, we were developing technologies for a network that
 7   we wanted to protect because developing these things is
 8   expensive.  And so we wanted to make sure that we had a basis
 9   for collecting revenue as we continued and support development
10   of new ideas.
11   Q    Now, who owned the patent when it was filed and when it
12   was issued?
13   A    Well, patents are -- are -- are filed and given to
14   inventors, to people.  The rights to these inventions can be
15   assigned to other entities like companies.
16        And it was very common back then, and even today, if you
17   work for a company and they're paying for your time for these
18   development ideas, if -- if you document and file the patent,
19   you get the patent.
20        It's very common to have your -- your rights assigned to
21   the company that you work for.  So you may not own the rights.
22   I don't have the rights to any of these patents, for example.
23   Q    Now, this patent, the '946 patent, did you assign that
24   patent to the company?
25   A    Yes.
```

```
 1   Q     Okay.  So, Mr. Hays, were you paid a base salary when you

 2   worked for the company?

 3   A     Yes.

 4   Q     And did you receive any special compensation when you were

 5   awarded patents?

 6   A     Well, I always wished I did, but I never received any

 7   special compensation for that.  So I always figured it was part

 8   of the job to do what I was doing.  And that's the way -- the

 9   other people felt the same.

10   Q     Are the -- are you proud of the work you did at MTel?

11   A     Yes.  I think it was -- it was a -- it was a chance to

12   develop something that had never been done before.  And it was

13   very helpful, I think, to the -- to the nation and to -- and to

14   the economy.

15   Q     Tell us, again, when you left MTel.

16   A     Well, I left MTel in 1999.  I think we mentioned earlier

17   that MTel had sold to MCI.  And I figured at that point of my

18   work with them, it was better for me to just to move on because

19   the development work would not be as intense as it was, and a

20   lot more routine than I'm used to.  So I went on to do other

21   startup type -- type activities.

22   Q     Mr. Hays, what happened to the -- your inventions,

23   including the '946 patent, when you left the company?

24   A     Well, as far as I know, they stayed with the company and

25   different owners took -- took ownership.  The patent rights
```

```
 1   went -- went to these companies.  But I don't -- I don't know
 2   the exact details of that.
 3   Q    Mr. Hays, let's -- let's talk a little bit about MTel, who
 4   is the Plaintiff here, and the MTel you worked for.
 5        Is the MTel that's the Plaintiff here different than the
 6   company that you worked for?
 7   A    Yes.  This is a different company that we're talking
 8   about.  I guess MTel, LLC you talked about, as opposed to the
 9   MTel that I worked for, are two different companies.  Although,
10   you know, the companies were acquired, but they were two
11   different companies.
12   Q    Okay.  How do you feel about the fact that the company
13   that's here today in this courtroom that calls itself MTel is
14   using the same name that was used at the company that you used
15   to work for?
16   A    Well, I'm very proud of the fact that all the work we did
17   to document and to seek patent protection on these ideas is --
18   you know, without this process, they just die and be part of
19   the paperwork in the Patent Office.  But now it has a real
20   chance to survive.
21        And -- and because it is a public document, it is
22   published.  Other people can build on these ideas and run with
23   them.  So I think it's a very good -- very good ending to what
24   we started.
25   Q    Mr. Hays, are you a consultant with MTel, the party here
```

1    today?

2    A     Yes.

3    Q     And are you paid as a consultant?

4    A     Yes.

5    Q     Do you have any stake in the outcome of this lawsuit?

6    A     No.  I have no stake in the outcome of the lawsuit.  Just

7    my time.

8    Q     Do you have -- do you have any ownership interest in MTel?

9    A     No, I have no ownership in this MTel.

10              MR. SCARDINO:  Thank you, Your Honor.  I pass the

11   witness.

12              THE COURT:  Cross-examination.

13              Mr. Selinger, are you going to use the chart?

14              MR. SELINGER:  I am not, Your Honor.

15              THE COURT:  All right.  You need to move it back to

16   where it was, Mr. Scardino.

17              MR. SCARDINO:  Yes, Your Honor.

18              MR. SELINGER:  May I deliver some --

19              THE COURT:  Yes, you may.

20              MR. SELINGER:  Thank you.

21              THE COURT:  And, Mr. Scardino, you need to turn the

22   page so it's a blank sheet of paper.

23              MR. SCARDINO:  Yes, Your Honor.

24              MR. SELINGER:  May I approach the witness, Your

25   Honor?

```
 1              THE COURT:  You may.

 2              All right.  Mr. Selinger, you may proceed.

 3              MR. SELINGER:  Thank you.

 4                        CROSS-EXAMINATION

 5   BY MR. SELINGER:

 6   Q    Hello, Mr. Hays.

 7   A    Good afternoon.

 8   Q    Pioneer Preference is not a patent, correct?

 9   A    You're correct.  Pioneer Preference is not a patent.

10   Q    You never applied to the Federal Communications Commission

11   to obtain a patent?

12   A    Correct.  The -- the application process, as was explained

13   earlier, is done through the PTO or Patent and Trademark

14   Office.

15   Q    And the '946 patent, which is one -- one you put up on the

16   screen, was not the basis for the Pioneer Preference, correct?

17   A    Well, the -- as we said, the Pioneer's Preference is

18   separate and apart from the patent process.  So that's a

19   correct assumption, yes.

20              THE COURT:  Mr. Selinger, pull the mic down a little

21   bit, please.

22              Thank you.

23   Q    (By Mr. Selinger) The -- the Pioneer Preference award that

24   your company obtained was for narrowband, correct?

25   A    Yes.  It was in response to the -- the FCC's report and
```

```
 1   order for a Pioneer's Preference proceeding that was
 2   specifically aimed at narrowband applications.
 3   Q    There -- there was also a Pioneer Preference award for
 4   broadband cellular license, correct?
 5   A    Well, the FCC had -- had two proceedings.  One of them was
 6   for narrowband and one was for broadband.  So they had an
 7   interest in both areas, yes.
 8   Q    And your company only applied for narrowband, correct?
 9   A    That's correct.  That was our -- that was our -- the field
10   we were operating in and the field we wanted to pursue the
11   work, yes.
12            THE COURT:  Mr. Hays, Counsel asked you:  Did you
13   just apply for narrowband?  And the answer was:  Yes.  He
14   didn't ask you why or what was the field your company was
15   working in.  You're giving more answer than the questions call
16   for.
17            Mr. Scardino's going to get a chance to get back up
18   and ask you other questions after Mr. Selinger is finished.  So
19   with that in mind, limit your answers to the questions that are
20   asked, please, sir.
21            THE WITNESS:  Yes.  Thank you.
22            THE COURT:  All right.  Let's proceed.
23   Q    (By Mr. Selinger) Mr. Hays, you have in front of you
24   Plaintiff's Exhibit 46.  That was the high-level system
25   description that your lawyer showed you.
```

```
 1   A     This is in the two books that you --
 2   Q     No.
 3   A     Oh.
 4   Q     This is the one that your lawyer -- your lawyer had.
 5   A     Oh, okay.  So I should get this book here?  Okay.
 6   Q     Yes, sir.
 7   A     Okay.  The high-level description, that's what we're
 8   looking at?
 9   Q     Yes, sir.
10   A     Okay.
11   Q     And the first page, I believe you said, has -- of
12   Plaintiff's Exhibit 46, has a date of May 4, 1999; is that
13   correct?
14   A     That's correct.
15   Q     The -- can you -- are you aware of whether there's an
16   earlier date in this document than a copyright notice of 1997?
17         And I'll represent to you I could not find one.
18   A     The only thing I notice is this is Revision 2.2, and I
19   don't know about the other revisions.  So the only one I'm
20   familiar with is this one that we have in front of us.
21   Q     Now, is this a complete copy of the SkyTel high-level
22   system description?
23   A     If you give me just a moment, I'll -- I'll verify it.
24         (Pause in proceedings.)
25         THE COURT:  Have you had enough time, Mr. Hays?
```

```
 1              THE WITNESS:  Yes.
 2   A    I wanted to verify it.  This -- this book is in two parts,
 3   Part 1 and Part 2.  But it looks like there was a repeat of
 4   Part 2, and I was trying to figure out why that was.  Also,
 5   there's a copyright notice in this one.  It's dated February
 6   the 5th, 1988.
 7   Q    (By Mr. Selinger) What -- what page is that on?
 8   A    It's -- well, it doesn't say the February part, but, if
 9   you turn on the second part -- if you turn to the -- okay.  If
10   you turn to the third page, it says 1997, but if you turn to
11   the fourth page, it says 1998, and that 1998 is continuing
12   through the document.
13   Q    1997 and 1998, correct?
14   A    Correct.
15   Q    Okay.  Let me -- let me ask you this --
16              MR. SELINGER:  May I get access to the ELMO, Your
17   Honor?
18   Q    (By Mr. Selinger) I'm putting -- this is the -- I'll
19   represent to you this is the table of contents from the first
20   section.
21        And will you agree with me that the table of contents
22   includes Section 1, the overview, and then everything under
23   Section 2 is about the NOC, the Network Operation Center?
24   A    Yes.
25   Q    And I'm going to put on the ELMO the table of contents
```

```
 1    from Page 2 HT -- MTel Bates No. 2633.
 2         And -- and would you agree with me that the table of
 3    contents on this portion of Plaintiff's Exhibit 46 is as you're
 4    looking at it?
 5    A    Yes.
 6    Q    And would you agree with me it doesn't mention mobile
 7    unit?
 8    A    When you say it, that's the Part 2 that we're talking
 9    about?
10    Q    Yes, sir.
11    A    The Part 2 doesn't mention mobile unit in -- in the table
12    of contents?
13    Q    Yes, sir.
14    A    I would agree with that.  I don't know that that would
15    extend to the actual text, though.
16    Q    SkyTel, I believe you testified, began operating its
17    nationwide pager -- two-way pager system in September of 1995,
18    correct?
19    A    That was the launch, yes.
20    Q    And -- and you agree that the application for the '9 --
21    '946 patent was filed about two years before that, correct, in
22    1993?
23    A    Yes.
24    Q    And you also agree that -- that the SkyTel commercial
25    two-way pager network used pagers that had automatic error
```

1   correction, correct?

2   A    What period are you talking about for the automatic error

3   correction?

4   Q    Let's start with the launch.

5   A    Okay.  You're correct.  That's -- they had the ARQ system

6   in that -- in that position, yeah.

7   Q    And -- and you don't recall whether SkyTel's commercial

8   two-way pager system ever had pagers that enabled the user to

9   see messages with errors and decide whether to ask for

10  retransmission or not, correct?

11  A    I didn't say that, and I don't concur with that, because I

12  actually used those kind of pagers that had that capability,

13  and I can -- I can recall using those pagers on the system,

14  yeah.

15      Now, are you -- are you trying to limit your question to

16  the time that we're talking about here or what?

17          THE COURT:  Mr. Hays, if you don't understand the

18  question, tell the lawyer you don't understand the question.

19  If you -- if you have any doubt about it, ask him to rephrase.

20  But we're not going to have a back and forth where you're

21  asking for clarification and he's giving it to you, and then

22  you're telling us something else.

23          You're here to respond to his questions.  And if you

24  don't understand his questions, please ask him to restate it

25  and tell him you don't understand it.  If you respond, he'll

```
 1   assume and I'll assume and everybody will assume you understand
 2   the question, all right?
 3               THE WITNESS:  Yes, sir.
 4               THE COURT:  Okay.  Ask your next question, Counsel.
 5               MR. SELINGER:  Thank you, Your Honor.
 6               Mr. Lodge, I believe you have -- could you pull up
 7   Defendant's Exhibit 1?
 8   Q    (By Mr. Selinger) And, Mr. Hays, the patent issued on
 9   May 19, 1998, correct?
10   A    Yes, correct.
11   Q    And, Mr. Hays --
12               MR. SELINGER:  Mr. Lodge, if you wouldn't mind
13   blowing up the last sentence in the abstract, the mobile --
14   yes.
15   Q    (By Mr. Selinger) Do you see that last sentence, Mr. Hays,
16   the mobile unit?
17   A    I'm trying to understand what you've got.
18   Q    It's now been highlighted for you.
19   A    Oh, yes.  I see where you high -- yes.
20   Q    And -- and that sentence says:  The mobile unit includes a
21   switch that allows a user to request the network to retransmit
22   a received message that contains errors, correct?
23   A    Correct.
24   Q    Was that a sentence that you wrote?
25   A    I don't recall writing a sentence like that.  In fact --
```

```
1    yeah.  So, no, it's not a sentence I wrote.

2    Q    Now, error correction was a focus of the '946 patent,

3    correct?

4    A    Error correction was a focus of the patent, correct.

5              MR. SELINGER:  Mr. Lodge, if we could take that one

6    down and go to -- go to Block 63 on the first page on the left.

7    Q    (By Mr. Selinger) Do you -- do you have that in front of

8    you, Mr. Hays, a blown-up part of Block 63?

9    A    Yes.

10   Q    And it says:  Continuation-in-part of Serial No. -- Patent

11   No. 5,590,403.

12        Did I read that correctly?

13   A    Yes.

14   Q    And you understand that a continuation-in-part means that

15   the '946 patent application was a follow-on that added

16   additional material to the specification of the '403 parent,

17   correct?

18   A    No.

19   Q    You didn't understand that?

20   A    Well, I don't understand the real meaning of

21   continuation-in-part applications.

22   Q    Were -- were you here for my opening statement?

23   A    Yes.  I had a hard -- difficult time hearing you back

24   there, but, yes, I was here.

25   Q    Do you recall that I showed a slide to -- to the jury with
```

```
 1   Figure 16 in the '403 patent and a comparison of -- of
 2   Figure 16 of the '946 patent?
 3   A    I don't -- I don't recall that slide, no.
 4        MR. SELINGER:  Ah, thank you, Mr. Lodge.
 5   Q    (By Mr. Selinger) Can you take a look at Opening Slide 15.
 6        Do you see -- do you agree that the top portion shows
 7   Figure 16 of the '403 patent, and the bottom portion shows
 8   Figure 16 of the '946 patent?
 9   A    Yes.
10   Q    And do you agree that -- that the one difference is
11   request retransmission button 1622?
12   A    Yes.  That's the difference in those two figures, yes.
13   Q    Thank you.
14        MR. SELINGER:  Mr. Lodge, would you please go to
15   Column 4 of the '946 patent?  It's PDF 39.
16        Back to Column 4, please.
17        And if you'll blow up the last paragraph on the
18   right-hand column, Lines 41 to Column 4, right.
19        Shrink that down just a little bit.
20   Q    (By Mr. Selinger) So this is -- this is a paragraph in the
21   background section of the '946.  Do you agree that in a
22   conventional communication system, the transmitters transmit
23   messages in blocks to a mobile unit, each block including an
24   error correction -- error correcting code?
25        It's being highlighted for you.
```

```
 1    A    Yeah.  Would you clarify something?  This is -- the
 2    wording for this particular patent, right, it's not like any
 3    conventional communication system.  This is a particular one,
 4    correct?
 5    Q    Well, these are -- these are words in a patent for which
 6    you signed an oath.
 7    A    I know, but your question was:  Do I agree with the way
 8    it's written, and I'm telling you, I don't understand the
 9    implication.  Is this -- is this conventional communication
10    system germane to all of them or to this particular patent?
11    Q    Do you not know?
12    A    I'm not -- I'm not a patent lawyer, so this verbiage, I
13    have to have some clarification to understand what you're
14    asking me.  And what I'm asking is, I don't understand the
15    verbiage.  Can you please explain it to me a little bit more?
16    Q    Sir, I'm hoping you would explain it as -- as the
17    co-inventor that was here.  Can you do so?
18              THE COURT:  All right, gentlemen.
19              MR. SELINGER:  I'm sorry.  I apologize, Your Honor.
20              THE COURT:  Well, the witness is either going to say
21    "I don't understand the question," or the witness is going to
22    give an answer.
23              I don't know how to be any clearer than I am about
24    that, Mr. Hays.
25              And, Mr. Selinger, if the witness indicates he
```

```
 1   doesn't understand the question, then we don't need a back and
 2   forth.  You just need to restate the question in hopefully a
 3   way that he can understand and answer.
 4              Now, let's proceed with answers from the lawyer
 5   and -- excuse me -- questions from the lawyers and answers from
 6   the witnesses.
 7              Ask your question.
 8              MR. SELINGER:  Thank you.
 9   Q    (By Mr. Selinger) Mr. Hays, do you agree that the first
10   four sentences in Column 4 of the '946 patent ending around
11   Line 60 describe conventional automatic error correction?
12   A    Yes.
13   Q    And do you agree that conventional automatic error
14   correction was not something invented by MTel in the early
15   1990s?
16   A    Yes.
17   Q    And looking at the last two sentences in -- in Column 4:
18   This technique ensures that messages are accurate but consumes
19   a great deal of airtime, driving up the costs of mobile
20   messaging, often needlessly.
21        Do you see that?
22   A    Yes.
23   Q    And did I read that correctly?
24   A    Yes, you read that correctly.
25   Q    And there -- and then it says:  Therefore, it would be
```

```
 1   desirable to reduce the needless retransmission of some message

 2   blocks to reduce costs and conserve system resources.

 3        Correct?

 4   A    Yes, that's what it says.

 5   Q    And -- and the solution was the request retransmission

 6   button to allow error correction to be user optional, correct?

 7   A    I'm not understanding that question.

 8   Q    Did the '9 -- is -- is it correct that the '946 patent set

 9   out to solve this problem -- or perceived problem of needless

10   retransmission of some message blocks?

11   A    Yes.

12   Q    And is it correct that --

13            MR. SELINGER:  You can take that down, Mr. Lodge.

14   Q    (By Mr. Selinger) Is it correct that the solution was to

15   add the request retransmission button 1622 so that a user, in

16   theory, could look at the received message and decide if it was

17   sufficiently correct or whether the user needed to request

18   retransmission of the message or a part of it?

19   A    Yes.

20   Q    Thank you.

21        Motorola -- is it correct that Motorola made pagers for

22   use in SkyTel's two-way pager system?

23   A    Could you clarify that to mean all pagers or some pagers

24   or...

25   Q    Is it correct that some of the pagers for the SkyTel
```

1   two-way paging system were made by Motorola?

2   A    Yes.

3   Q    And you -- you, in fact, worked with people from Motorola

4   to have pagers made that would work in the SkyTel -- SkyTel

5   two-way paging system, correct?

6   A    Yes.

7   Q    Do you recall working with a man at Motorola named John

8   Kane?

9   A    I don't recall a John -- John Kane?

10  Q    Yes, sir.

11  A    No.

12  Q    Do you -- do you still use the POP application on your

13  smartphone?

14  A    Would you clarify that, the word "POP," I guess, or the

15  words you're --

16  Q    Do you recall testifying in the past that you used the POP

17  application on your smartphone?

18           MR. SCARDINO:  Your Honor, objection; relevance.

19           THE COURT:  Overruled.

20  A    Yes, I used the POP application as an email, yeah.

21  Q    (By Mr. Selinger) Do you agree that the '946 patent does

22  not contain the word "email"?

23  A    I would have to read the patent more closely to say -- to

24  answer that.

25  Q    Let me ask you this:  Will you take my representation to

```
1   you that the '946 patent does not contain the word "email"?

2   A    Not without examining the patent.

3   Q    You knew you were going to -- you were coming here to

4   testify today, correct?

5   A    Yes.

6   Q    You knew you were going to be questioned about the '946

7   patent, correct?

8   A    Yes.

9   Q    You're -- you're a consultant -- are you a consultant to

10  the Reed & Scardino firm or to MTel?

11  A    My contract is with the Reed & Scardino firm, so,

12  technically, I'm a consultant to them.

13  Q    And those are the lawyers sitting here at counsel table,

14  correct?

15  A    Yes.

16  Q    Did you happen to hear me say during opening that the

17  United States Patent and Trademark Office rejected the

18  application for the '946 patent five different times?

19  A    Yes.  I heard your statement.

20  Q    And you -- you agree with that statement, correct?

21  A    Well, please clarify what you mean by -- I don't know what

22  the implication of your question is, so I don't know how to

23  answer it, I guess.

24  Q    Well, do you agree -- let me clarify.

25       Do you agree that the United States Patent and Trademark
```

```
 1   Office examiner issued five separate rejections stating
 2   rejected?
 3   A     I don't understand the term "issued rejection."
 4   Q     You were the point person at MTel in connection with
 5   obtaining patents, correct?
 6   A     The point person, yes, uh-huh.
 7   Q     And -- and you received communications when -- when the
 8   Patent Office responded to applications from your company,
 9   correct?
10   A     No.  My patent lawyers received those communications
11   from --
12   Q     And they --
13   A     -- and involved me.
14   Q     And they sent them to you, right?
15   A     Occasionally, yes.
16   Q     When you worked at the Mississippi MTel, you maintained a
17   record book with notes about things you were doing on technical
18   projects, correct?
19   A     I had at least one notebook, correct.
20   Q     And you never saw your notebook again after you left your
21   job in 1999, correct?
22   A     No.
23   Q     No, it's correct?
24   A     I never saw the notebook again, so yeah.
25   Q     And you don't recall what -- what notes you made in that
```

```
1    record book, do you?

2    A    No, except for that one page that you showed me.  That's

3    the only one.

4    Q    And that was -- that was during your deposition?

5    A    That was during a deposition.

6    Q    And that -- that was not about the '946 patent, correct?

7    A    Correct.

8    Q    Now, the reason the system you disclosed in the '946

9    patent had a message retransmitted was because there was an

10   error in a portion of the message that the mobile unit

11   received, correct?

12   A    Could you clarify your question as to whether you're

13   talking about automatic system or the manual system?

14   Q    I'm talking about the system disclosed in the '946 patent.

15   A    There's -- there's two systems disclosed in the patent,

16   so...

17   Q    That -- that's correct, isn't it?  There's an automatic

18   error correction system --

19   A    And a manual.

20   Q    -- and right -- right after it is the manual?

21   A    Yes, correct.

22   Q    And the reason the manual system was disclosed by you, the

23   reason the manual system had a message retransmitted was

24   because --

25                MR. SELINGER:  Strike that.
```

```
1    Q    (By Mr. Selinger) The automatic system disclosed in the
2    '946 patent retransmitted a message automatically if there was
3    an error in a portion of the message received by the mobile
4    unit, correct?
5    A    Could you clarify that as meaning did or could?
6    Q    Did.
7    A    Did do, right?
8    Q    Yes.
9    A    Not could do?  I would say no.
10   Q    That wasn't how the automatic error -- that wasn't how the
11   automatic error correction you disclosed worked?
12   A    My point is there are two systems disclosed.  You're not
13   limited to either one system.  So one doesn't preclude the
14   other one.
15   Q    Your understanding of the invention of the '946 patent is
16   that the original message is transmitted, it shows up with an
17   error, and the user decides whether to request a retransmission
18   of the error so the message would become readable, correct?
19   A    Yeah.  I -- I need a clarification on that one.  Are you
20   talking about the manual system or the automatic system?
21   Because one is not -- both -- both are allowed in the patent,
22   so I don't know how to answer that exactly.
23   Q    I'm talking about the manual system.
24   A    The manual system allows the -- as you stated, yes.
25   Q    Now, you don't recall any analysis in 1993 of what costs
```

 1   might be increased as a result of giving the user the option of

 2   reviewing the message that might be corrupted instead of

 3   automatically having the user receive a corrected message?

 4   A    No.

 5   Q    Your understanding as a co-inventor with respect to the

 6   user optional manual message delivery was that the mobile --

 7   mobile unit receives something for at least the second time

 8   when it is being transmitted?

 9   A    I'm sorry.  I didn't hear the question completely.  Could

10   you repeat it, please?

11   Q    Yes.  Your understanding as a co-inventor was that the

12   '946 patent disclosed that the mobile unit receives something

13   for at least the second time when it is being retransmitted?

14           MR. SCARDINO:  Your Honor, I'm going to object to

15   that.  It's improper expert opinion testimony.  Mr. Hays is not

16   here as an expert.  He's here as a fact witness.

17           THE COURT:  Overruled.  He's asking him what the

18   patent that he's one of the co-inventors on does or doesn't do.

19   That doesn't call for an expert opinion.

20           Can you answer the question, Mr. Hays?

21   A    I'm still lost in the question.  Maybe I'm not hearing

22   this thing properly, but if you would indulge me and maybe say

23   it one more time, I can answer it.

24           THE COURT:  Mr. Selinger, would you restate your

25   question, please?

```
 1              MR. SELINGER:  I will, Your Honor.

 2   Q    (By Mr. Selinger) Your understanding as a co-inventor of

 3   the '946 patent was that retransmitting a message to the mobile

 4   unit meant having the central control computer send the message

 5   again to the mobile unit?

 6   A    Yes.

 7   Q    Your understanding as the co-inventor of the '946 patent

 8   was that retrieving an attachment which has not been downloaded

 9   with the -- with the email was not a retransmission?

10              MR. SCARDINO:  Objection, Your Honor.  This is the

11   infringement scenario that's in this case.  This is expert

12   opinion.  This is the stuff for experts in this case and not

13   for Mr. Hays, who hasn't had a chance to look at the

14   information.

15              Furthermore, inventor testimony on the claims, as

16   Your Honor has ruled, is not relevant, and that's exactly what

17   he's trying to elicit.

18              THE COURT:  I'll sustain that objection.  I think

19   we've gone across the line, Mr. Selinger.

20              MR. SELINGER:  May I respond briefly, Your Honor?

21              THE COURT:  No.  I've ruled on it.  You can ask your

22   next question.

23              MR. SELINGER:  Thank you.

24   Q    (By Mr. Selinger) An email and an attachment and a link to

25   request the attachment, in your opinion, had nothing to do with
```

```
1    what you understood you had disclosed in the '946 patent?

2              MR. SCARDINO:  Your Honor, may I approach, please?  I

3    object, and I don't want to --

4              THE COURT:  Approach the bench.

5              MR. SCARDINO:  Thank you.

6              (Bench conference.)

7              MR. SCARDINO:  I've got some cases.  Can I -- Your

8    Honor, Howmedica, the Federal Circuit in Howmedica.

9              THE COURT:  State your objection, Counsel.

10             MR. SCARDINO:  Your Honor, my objection is this

11   question calls for improper expert testimony with respect to

12   the accused system and the accused apparatus in this case,

13   which relates to emails and email attachments.  And he's asking

14   him if the patent covers that accused implementation.

15             THE COURT:  Response?

16             MR. SELINGER:  That's not what I'm doing.  I'm asking

17   him for his understanding of what it was he'd invented.  The --

18   this goes to my written description defense where the

19   difference between the claim, as Your Honor has construed it,

20   and what the inventor -- inventors regarded as their invention,

21   what they disclosed is a basis for invalidating the patent.

22             The case I have, Gentry Gallery, the Federal Circuit

23   relied on inventor testimony to hold the patent invalid under

24   written description.

25             And I'm not asking him what -- what his claims cover.
```

```
 1    I'm asking what he -- he understood he invented.  If the claims
 2    are different than that, then that goes to written description
 3    and validity.
 4              MR. SCARDINO:  May I respond, Your Honor?
 5              THE COURT:  You may.
 6              MR. SCARDINO:  Your Honor, that is absolutely not
 7    what he's doing.  The claims don't say anything about emails,
 8    anything about attachments.  If he was trying to compare the
 9    written description to the claims, he'd be asking him about
10    claim language and where that claim language is in the
11    description.  This is nothing more than a question about the
12    accused implementation and infringement.
13              THE COURT:  And you've already made the point,
14    Mr. Selinger, that the word "email" is not in the patent.
15              MR. SELINGER:  Well, he didn't -- except he wouldn't
16    answer me.
17              THE COURT:  Well, he's being very evasive.  And
18    I'm -- I'm about as frustrated with the situation as I can
19    remember being in a long time.
20              You may certainly ask him what he invented, but you
21    cannot ask him to -- to interpret or define the claims in the
22    patent.  You're going to have to ask him conceptually,
23    topically, what his patent covers.
24              But if you get into specific questions about the
25    meaning of the claim language, I'm -- I'm going to stop you
```

```
 1    because that's not proper with -- with an inventor, non-expert.
 2              MR. SELINGER:  And I -- I apologize if I did, Your
 3    Honor, but the -- the words I had in -- in the claim -- in my
 4    question were about "email" and "download link" which aren't in
 5    the claim.
 6              So that's exactly what I was trying to do.
 7              THE COURT:  Well, I'm going to sustain the objection
 8    as to this question.
 9              Mr. Selinger, go to the podium and ask your next
10    question.  You are permitted to inquire from the witness his
11    understanding of what he invented.  You are not entitled to ask
12    him to compare or comment or opine about the meaning of the
13    claims themselves.
14              MR. SELINGER:  And -- and that was not my intent.
15              May I ask one more question?
16              THE COURT:  Yes, sir.
17              MR. SELINGER:  I have his prior testimony on -- on
18    some of these, and could I just ask him if he said that?
19              MR. SCARDINO:  Your Honor, I'm sorry.  May I respond?
20              THE COURT:  Well, I don't know what this prior
21    testimony is.  I mean --
22              MR. SELINGER:  Deposition testimony.
23              THE COURT:  You can certainly attempt to impeach him
24    with his prior deposition testimony.
25              MR. SCARDINO:  Your Honor, may I make one comment to
```

```
 1   that?
 2          This is the very testimony that they designated
 3   for -- to play for depositions if Mr. Hays wasn't called live.
 4   We had objections to these deposition clips that he's going to
 5   use for impeachment because they're improper in front of the
 6   jury coming from an inventor.
 7          They're more prejudicial than probative because the
 8   Federal Circuit has said that questions from the inventor about
 9   claim scope, meaning of the claims, comparing the claims to the
10   accused apparatus is improper and irrelevant in front of the
11   jury.
12          The Howmedica case --
13          THE COURT:  Well, if the questions that he asked do
14   not inquire as to claim scope, then there shouldn't be any
15   basis to impeach him with deposition testimony about claim
16   scope.
17          MR. SCARDINO:  Understood, Your Honor.
18          THE COURT:  All right.
19          MR. SELINGER:  Thank you.
20          MR. SCARDINO:  Let's proceed.
21          (Bench conference concluded.)
22          THE COURT:  Let's proceed, Counsel.
23   Q    (By Mr. Selinger) Mr. Hays, you agree that the process for
24   displaying errors and messages on the display unit is not
25   described in the '946 patent, correct?
```

1    A    I can't recall if it's disclosed in that or not.

2    Q    Do you recall having your deposition taken in March of

3    2014?

4    A    Yes, I believe you were there.

5    Q    No.  That was someone else.

6    A    Oh, someone else.  Okay.

7    Q    Do you recall --

8              THE COURT:  All right, gentlemen.  This is exactly

9    what I've tried to talk to both of you about.  He asked you if

10   you recall that your deposition was taken.  Yes.

11             And this exchange about, I was there; no, it was

12   somebody else, that's way beyond what was asked for.  You both

13   need to limit your questions and answers to the specific topic

14   and not go beyond what's been presented.

15             I don't know how to be any clearer.  If I need to

16   find a better way to get your attention, I'll find a better

17   way.  But I mean what I say when I want answers limited to

18   questions asked.

19             Let's proceed.

20             MR. SELINGER:  Mr. Lodge, can we have DTX-1, PDF 7?

21   Q    (By Mr. Selinger) Mr. Hays, this is Figure 6 from the '946

22   patent.

23             Do you recognize it?

24   A    Yes.

25   Q    And do you see that there is one mobile unit, 624?

```
1    A     Yes.

2    Q     And -- and do you see that there's a Network Operation

3    Center, 600, in the lower left-hand corner?

4    A     Yes.

5    Q     And there's a satellite, 606, in the upper right-hand

6    corner -- left-hand corner?

7    A     Yes.

8    Q     And you see there are some base transmitters?

9    A     Yes.

10   Q     And there are some base receivers?

11   A     Yes.

12   Q     And there are two regional stations?

13   A     Yes.

14   Q     There's no email server, correct?

15   A     That's not correct.

16   Q     And this figure, do you see the words -- do you see a

17   block for email server?

18   A     I don't see a block that says email server, no.

19               MR. SELINGER:  May I have one minute, Your Honor?

20               THE COURT:  You may.

21               (Pause in proceedings.)

22               MR. SELINGER:  Pass the witness, Your Honor.

23               THE COURT:  Redirect?

24               MR. SCARDINO:  Yes, Your Honor, briefly.

25               THE COURT:  Proceed.
```

```
 1                    REDIRECT EXAMINATION
 2   BY MR. SCARDINO:
 3   Q    Mr. Hays, you were asked about this --
 4             MR. SCARDINO:  I'm going to go to the document cam.
 5   Q    (By Mr. Scardino) The SkyTel high-level description and
 6   the -- and the dates in there.
 7   A    Yes.
 8   Q    Do you recall that?
 9   A    Yes.
10   Q    And it says, date, 1999, on the front?
11   A    Yes.  Yes.
12   Q    It also says on each page of the first part -- I think you
13   were talking about the second part during your
14   cross-examination, but what does it say at the bottom of each
15   page of the first part where the copyright notice appears?
16   A    MTel Technologies, Incorporated, 1997.
17   Q    That slipped a little bit, but you can still see it.
18        So when did that indicate to you this information was
19   created?
20   A    The copyright was 1997, so it would be 1997.
21   Q    I'm going to look at the table of contents.  You were also
22   asked about this table of contents and Section 2, the NOC.  Can
23   you read for us what is under Section 2.1?
24   A    Under 2.1, it's 2.1.1, which is the personal messaging
25   unit, PMU.
```

```
1    Q    What is that?

2    A    That's the pager, essentially.  That's -- that's the

3    mobile device that the subscriber would carry.

4    Q    So did you use different terms like "PMU mobile device,"

5    "mobile unit," and "pager" when you were at SkyTel?

6    A    We used different terminology, but PMU was the one that

7    was -- would encompass all of that, yeah.

8    Q    Okay.  What about "mobile unit"?  Was that a term you

9    used?

10   A    "PMU" is the term we used, so...

11   Q    At SkyTel?

12   A    Yes.

13   Q    Okay.  Do you recall you were asked questions about the

14   '946 patent and the error correction embodiment?

15   A    Yes.

16   Q    Okay.  Do you recall whether there's another embodiment in

17   the patent that talks about where I've highlighted here,

18   "partially received messages"?

19              MR. SELINGER:   Objection --

20   A    Yes.

21              MR. SELINGER:  -- leading, Your Honor.

22              THE COURT:  Sustained.

23   Q    (By Mr. Scardino) Mr. Hays, what do you see here in

24   Column 15, Lines 5 -- I'm sorry -- Line 20?  What is the patent

25   discussing there?
```

```
 1   A    If the message W -- WAI was only -- if the message was
 2   only partially received, the negative acknowledge signal --
 3   Q    I'm sorry --
 4   A    -- indicates --
 5              MR. SELINGER:  Could I have him finish his answer?
 6              MR. SCARDINO:  Yeah.  I just put it back up there.
 7              MR. SELINGER:  Sorry.
 8   A    -- indicates that the Network Operatives -- Operation
 9   Center should be -- should rebroadcast the message to the
10   mobile unit.
11   Q    (By Mr. Scardino) So this is talking about messages that
12   are only partially received?
13   A    That's what it's talk -- yes.
14   Q    And let's look at another part of the patent which I've
15   highlighted there.  Can you read that highlighted part?
16   A    If the mobile unit 624 does not completely receive the
17   message --
18   Q    Okay.  You can stop there.  And then just the last one
19   that I've highlighted there.  Can you read that, please?
20   A    The message has not been completely or properly received.
21   Q    Okay.  So you said that your patent was focused on -- one
22   of the focuses was on error correction techniques using the
23   retransmission button during your cross-examination.
24   A    Yes.
25   Q    As you've seen here, was your patent also focused on a
```

```
 1   situation where messages were only partially received?
 2             MR. SELINGER:  Objection; leading, Your Honor.
 3             THE COURT:  Sustained.
 4   Q    (By Mr. Scardino) Did your patent have another scenario?
 5   A    Well, the other scenario is when the messages were only
 6   partially received, yeah.
 7   Q    Okay.  Now, let's look at the Figure 6.  And Counsel for
 8   HTC was discussing Figure 6 with you.  Did I hear you
 9   correctly, did you disagree with him about the email server
10   question?
11   A    I disagreed because it shows a Network Operation Center,
12   which we've always felt was a collection of servers for the
13   network.  And this would be the logical extension of the
14   Network Operation Center to say it has an email server.
15   Q    And so could you do -- send emails in the SkyTel network?
16   A    Yes.
17   Q    And would those emails go through those servers in the
18   Network Operation Center?
19   A    Yes.
20   Q    Thank you, Mr. Hays.
21             MR. SCARDINO:  No more questions, Your Honor.
22             THE COURT:  You pass the witness?
23             MR. SCARDINO:  Pass the witness, Your Honor.
24             THE COURT:  Additional cross, Mr. Selinger?
25             MR. SELINGER:  No, Your Honor.
```

```
 1              THE COURT:  You may step down, Mr. Hays.
 2              THE WITNESS:  Thank you.  You want to collect all
 3   these books here?
 4              THE COURT:  Just leave them there, please, sir.
 5              Plaintiff, call your next witness.
 6              MR. DACUS:  Your Honor, we call Andrew Fitton.
 7              THE COURT:  If you'll take the stand, Mr. Fitton.
 8              Okay.  Counsel, proceed.
 9              MR. DACUS:  Thank you, Your Honor.
10        ANDREW FITTON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
11                      DIRECT EXAMINATION
12   BY MR. DACUS:
13   Q    Mr. Fitton, would you introduce yourself to the jury by
14   telling them your name, please, sir?
15   A    My name is Andrew Fitton.
16   Q    Okay.  And, Mr. Fitton, are you married?
17   A    I am married to a long-suffering wife of 35 years called
18   Ros.
19   Q    And do you have children?
20   A    I have four children from ages 29 down to 24, I think.
21   Q    And where do you live?
22   A    I live in Austin, Texas.
23   Q    Okay.  And tell the jury -- they've probably figured out
24   by now, you didn't grow up in Austin.  Where did you grow up?
25   A    No.  I -- I obviously wasn't born in Austin, Texas.  I was
```

1  born in the north of England, and I've lived most of my life

2  in -- between London and spending about a third of the year in

3  the USA.

4  Q    And tell the jury, if you would, please, sir, what is your

5  role at MTel?

6  A    I'm the chairman and chief executive of United Wireless,

7  Inc. -- United Wireless Holdings, Inc., which is the parent

8  company of MTel, and MTel is the Plaintiff in this case.

9  Q    Does that mean that United Wireless owns MTel?

10  A    Yeah.  United Wireless is the hundred percent owner of

11  MTel.

12  Q    Okay.  And where are United Wireless and MTel based or

13  located?

14  A    United Wireless has its headquarters in Austin, Texas, in

15  a building called 515 Congress, and MTel has its office in

16  Lewisville, Texas.

17  Q    Tell the jury, if you would, sir, briefly what your

18  educational background is.

19  A    I was educated at a -- what we call a grammar school in

20  the UK up to the age of 18, and then I then went on to

21  university to study economics and accountancy.

22  Q    Did you get a degree from the university?

23  A    No.  I -- once I was at the university, I purchased an

24  interest in a business, and I left the university after two

25  years to go and run that business.

```
1   Q    So would you tell the jury briefly how you got started in
2   the working world?
3   A    Well, I -- I think I was in the working world when I was
4   quite -- when I was in my teenage years, actually.  My father
5   died when I was very young, so I was -- we didn't have a lot of
6   money, and so everybody went out to work.  And I pretty quickly
7   gained an interest in business.
8        And in 1981, I think it was -- 1980, I -- I was at
9   university, and I got the opportunity to purchase an auto
10  repair business which was about to go into bankruptcy.  And I
11  purchased a 50 percent share in that business and went to run
12  that.
13  Q    Would you tell the jury briefly, sir, what you've done in
14  your professional career from a business standpoint, walking us
15  forward from the auto repair shop that you owned?
16  A    Well, I studied the auto repair shop for about two years,
17  and I continued on for about two years after that.  And then
18  actually sold it to the guys who -- who ran it for me
19  day-to-day.  And subsequent to that, I became very interested
20  in companies that had -- were in financial difficulty or were
21  in need of restructuring.
22       And in the 1980s, I joined a computer company, mainframe
23  computer company, and I joined originally as assistant to the
24  managing director and a couple of years later became the
25  managing director of the company.  And that company was called
```

```
1   Mega Leasing.  It was one of the biggest mainframe leasing
2   companies in the UK at the time.
3       While I was there, I started a business as well called
4   Datacom, which was a data communications business.  And then in
5   1987, I left there and became chief executive of a general --
6   of an industrial services company.  Subsequently became
7   chairman of a medical services company.
8       And then in the late '90s, returned to the data
9   communications market by purchasing a business that was
10  involved in the tracking of vehicles and the monitoring of
11  parking meters and things like that.  And that took me back
12  really into the data communications field.
13  Q   Tell the jury whether or not you have any experience in
14  your professional life in the wireless data communications
15  area.
16  A   Well, having been in the wire -- wireline data
17  communications area, what I realized in the late 1990s was that
18  there was going to be a big shift toward wireless data.
19      When I started in business, there were no mobile -- no
20  mobile phones, so pretty shortly afterwards, we ended up with
21  those very large mobile phones that we all remember really
22  didn't do very much.  Many could connect; many couldn't connect
23  and only -- only lasted a few hours before the battery ran out
24  anyway.
25      And -- but nobody was transmitting any data.  And what had
```

1   happened in the -- in the wireline, in the world of computers

2   linked by wires, was that it really all became about how you

3   communicate, how you send the data between devices.

4        And so once we had mobile networks, it became obvious that

5   you would try and do the same over wireless networks.  But

6   sending data over wireless networks, that was pretty -- at that

7   point in time was very novel.  And there were probably only two

8   or three technologies in the world that could send tech -- data

9   over wireless networks.

10       And so in 2000, my company purchased a network called --

11  which became known as Transcom from BellSouth, the -- now --

12  now AT&T.  And that network was -- covered the whole of the UK

13  and transmitted data for people like UPS and FedEx and people

14  like Parkeon who were monitoring parking meters and people

15  sending messages.  We had handheld devices, similar to the

16  early -- we had devices similar to the early Blackberries

17  running on that network as well.

18  Q    Did that network have a name?

19  A    It was originally called RAM Mobile Data, but we changed

20  its name to Transcom.  And it was later purchased by British

21  Telecom, which is the AT&T of the UK.

22  Q    Tell the jury when it is that you formed the United

23  Wireless company and why --

24  A    Well, the -- the technology, the particular technology

25  that we were using in the UK was a technology called Mobitex.

```
1   And that was a technology by Ericsson of Sweden.  And Ericsson

2   was one of the biggest telecommunications -- infrastructures in

3   the world.

4       And they had built a number of networks or they supplied

5   the equipment for a number of networks to be built around the

6   world using this technology, I think in total about

7   33 networks, the largest of which was actually in the U.S.,

8   unsurprisingly.

9       It was a national network, and it was called RAM Mobile

10  Data, too.  And subsequently, it would be renamed Velocita.

11  Now, that network was owned by BellSouth.

12          THE COURT:  Mr. Fitton, when did you form United

13  Wireless Company?  That was the question.

14  A   2007.

15          THE COURT:  I'm going to say the same thing I said to

16  the prior witness.  Try to limit your answers to the questions

17  asked, okay?

18          THE WITNESS:  Yes, Your Honor.

19  Q   (By Mr. Dacus) And did you form United Wireless in 2007

20  for a specific purpose?

21  A   We formed it to Velocita Wireless from Sprint.

22  Q   And what was Velocita Wireless at a high level?

23  A   It was the U.S. national wireless data network using the

24  Mobitex technology.

25  Q   Did United Wireless ever purchase another wireless data
```

```
1   communications network other than the Velocita purchase?

2   A     In 2008, we purchased the SkyTel network.

3   Q     And from whom did you buy the SkyTel network?

4   A     From a company called Bell Industries.

5   Q     And can you tell the jury generally why you bought the

6   SkyTel network, why United Wireless bought it?

7   A     We were interested in the network because it was the

8   premier national paging network, but it was capable of being

9   used for other functions.  And we were interested in doing

10  machine-to-machine communications over that network.

11  Q     Is the SkyTel network that United Wireless purchased the

12  same SkyTel network that was owned by MTel back in the early

13  and mid '90s?

14  A     I think by this time, it was even bigger.

15  Q     But it was the same; is that correct?

16  A     It is the same.

17  Q     Now, did -- when you purchased the Sky -- when United

18  Wireless purchased the SkyTel assets, what did it purchase?

19  A     We purchased everything, the base stations, the customers,

20  the payables, the desks, the chairs, everything that was

21  included in running the business, including the patents and

22  some trademarks.  And we -- we also assumed some liabilities.

23  Q     The '946 patent that is at issue here, was that part of

24  United Wireless's purchase of the SkyTel assets?

25  A     It was.
```

```
1   Q    At that -- at the time of United Wireless's purchase the
2   SkyTel assets, who were SkyTel's largest customers?
3   A    The largest customer was the U.S. Government, and then
4   there were many other customers, many other major corporations,
5   such as Coca-Cola, Disney, General Electric, but the largest
6   was certainly the government.
7   Q    When you purchased the SkyTel assets, did you purchase it
8   specifically for the patents?
9   A    No.  We -- we purchased it because we thought it was an
10  interesting business.
11  Q    And what -- what were your plans for that business?
12  A    Our original plan was actually to integrate our Mobitex
13  network with the SkyTel network and create one very large
14  national machine-to-machine network.
15  Q    When you bought the SkyTel assets in 2008, what was the
16  state of the wireless communications industry from your
17  experience and perspective?
18  A    It was a point of explosion, which had been predicted,
19  though I don't think anybody thought it was going to happen
20  quite as quickly as it happened.  But we went from people
21  transmitting relatively small amounts of data to wanting to
22  transmit large amounts of data literally overnight.  It's what
23  some people called the data crunch or data explosion.
24  Q    Is the SkyTel network still operational today?
25  A    It is.
```

```
1    Q    And who operates it?

2    A    It's operated by American Messaging in Lewisville, Texas.

3    Q    Now, when you purchased -- I keep saying "you."  I mean,

4    United Wireless purchased the SkyTel assets, did you or anyone

5    at United Wireless know that the patents were valuable?

6    A    No.

7    Q    And -- and you are here in this courtroom telling this

8    jury that they're valuable, correct?

9    A    Yes.  Yes.

10   Q    Why is it that you say now they're valuable, but at the

11   time that you bought, you didn't know they were valuable?

12   A    Intellectual property always have a value, particularly in

13   a technical environment, but you don't necessarily know exactly

14   what value it has at any point in time until such time as it's

15   needed.

16   Q    When you bought the SkyTel assets, did you know that HTC

17   was going to infringe on the '946 patent?

18   A    No.

19   Q    When -- when you bought -- when United Wireless bought the

20   SkyTel assets, did you know that other phone manufacturers were

21   going to use the '946 patent and want a license to it?

22   A    No.

23   Q    And remind the jury, from whom did you buy the SkyTel

24   assets?

25   A    A company called Bell Industries.
```

```
1   Q    And to your knowledge, did Bell Industries, when it sold
2   the patents, know that HTC and other phone manufacturers were
3   going to use the '946 patent in the future?
4   A    As far as I'm aware, they had no knowledge.
5   Q    Now, in your experience in wireless data communications,
6   is capacity an issue within the network?
7   A    Capacity is probably the No. 1 or No. 2 issue in running
8   any network.
9   Q    And -- and why so?
10  A    As -- as it's been described before, bandwidth is -- is
11  limited.  People like to think that it's unlimited, and perhaps
12  we get confused by the fact that cellular operators offer
13  unlimited data plans, but the truth is there's only so much up
14  there in the sky.
15       And what's more important is, when you're granted a
16  license, the pipe that you're given is the limitation on -- on
17  your bandwidth.  And once that becomes full, you have real
18  issues.
19  Q    Why did you choose the name MTel for the company that now
20  owns these patents?
21  A    Because it was a -- a good name, a trade name -- or it's a
22  bit like a patent in some ways.  We all like great trade names,
23  you know.  And what part -- when we acquired the assets from
24  Bell Industries, we acquired a number of trademarks and domain
25  names, including SkyTel and -- and including the right to use
```

1    the MTel name.

2        And as a further point, it was a good name for a company.

3    People recognized it within the industry.  And it paid some

4    sort of respect to the guys who'd started what was a very

5    important company back in the 1980s and '90s.

6            MR. DACUS:  Mr. Gros, can you pull up Exhibit PX-16,

7    please?  And can you go to the fourth page?

8            Yes, sir.  Let me backtrack a bit.  Would you stay on

9    the first page just for a second?

10   Q    (By Mr. Dacus) You have PX-16 in front of you, Mr. Fitton.

11   Can you tell the jury what they're seeing in PX-16?

12   A    This is the assignment of patents that was signed in June

13   of 2008 when we acquired the assets from Bell Industries -- the

14   SkyTel assets from Bell Industries.  And as you can see there,

15   they were acquired initially by a company called Velocita

16   Wireless, LLC, which was a network company.

17   Q    And was Velocita Wireless owned by United Wireless?

18   A    It was, 100 percent.

19           MR. DACUS:  And can we go to Page 4, please,

20   Mr. Gros?

21   Q    (By Mr. Dacus) And will you tell the jury on this Page 4

22   of PX-16 whether or not you see the '946 patent and -- on this

23   page?

24   A    It's at Line -- it's at No. 22, Patent 5,754,946.

25   Q    So was it your understanding, as a result of this

```
 1   transaction that, the '946 patent had been transferred to
 2   Velocita Wireless?
 3   A    It was.
 4   Q    Okay.  And then was the '946 patent transferred to other
 5   companies under the United Wireless umbrella of companies?
 6   A    It was.
 7   Q    And ultimately, was it transferred to a company with the
 8   name of MTel, LLC?
 9   A    It was.
10   Q    And that's the Plaintiff in this lawsuit; is that correct?
11   A    It is.
12            MR. DACUS:  We can take that down, Mr. Gros.  Thank
13   you.
14   Q    (By Mr. Dacus) Mr. Fitton, do any other companies have the
15   rights to use the '946 patent?
16   A    A number of companies, yes.
17   Q    Okay.  And how did they acquire those rights?
18   A    They entered into license agreements with MTel.
19   Q    And so that the jury understands, what's -- what's your
20   understanding of what a license is?
21   A    A license is a right to use the technology for a -- for a
22   period of time.
23   Q    And did those companies that -- that you've told them have
24   a right to use the '946, did they pay for that right or
25   license?
```

```
 1   A      Yeah, they did.

 2   Q      Okay.  Does Apple have a license to the '946 patent?

 3   A      It does.

 4   Q      Does LG, the phone manufacturer, have a license?

 5   A      It does.

 6   Q      Does Samsung have a license?

 7   A      It does.

 8   Q      Does AT&T have a license?

 9   A      Yes.

10   Q      Does T-Mobile have a license?

11   A      Yes.

12   Q      And did each one of those pay for the right to the use of

13   the '946 patent?

14   A      They did.

15              MR. DACUS:  Your Honor, may we approach?

16              THE COURT:  You may.

17              (Bench conference.)

18              MR. DACUS:  I'm at the end of my examination, Your

19   Honor, but at this point, I was going to elicit the amounts of

20   those licenses which would require us to clear the courtroom.

21   So I just wanted guidance from the Court.

22              THE COURT:  Is that -- is that all the direct you

23   have with this witness?

24              MR. DACUS:  Yes, sir.

25              THE COURT:  What do you expect your cross to be?
```

```
 1              MR. GILLAM:  Oh, I expect to be, you know, 20,

 2    30 minutes or so.

 3              THE COURT:  Okay.  Do you have any cross directly

 4    related to the confidential information that you can go into --

 5              MR. GILLAM:  Yes, sir.

 6              THE COURT:  -- that you could go into at the

 7    beginning, and we could leave the courtroom sealed, rather than

 8    resealing it later?

 9              MR. GILLAM:  Right.  I can go into -- the

10    confidential information that I would deal with would be --

11    actually, I was going to deal with it at the end, but should

12    the Court want me to do it at the beginning, I could do it at

13    the beginning just to make sure we -- you know, there's some --

14              THE COURT:  Well, if you could do it at the

15    beginning, then I could seal the courtroom, he could finish,

16    pass the witness, you could do that, and then we could unseal

17    it.  And at that point, probably break for the day.

18              MR. GILLAM:  All right.  So we're up here.  As long

19    as we're going to do this, I want to be able to also talk about

20    the fact that those were through litigation.

21              You know, he's -- he's implied -- and we've already

22    talked about this as well, but the -- those -- those licenses

23    were not asked for or requested by these companies, and they

24    were only as a result of litigation.

25              THE COURT:  We've talked about the fact there's no
```

```
 1   MIL order on the litigation issue.

 2             MR. DACUS:  I agree.

 3             THE COURT:  These are the ones that are going to say

 4   "Settlement Agreement" at the top, aren't they?

 5             MR. DACUS:  Yes, Your Honor.

 6             MR. GILLAM:  They are.

 7             THE COURT:  All right.  Do you see a problem,

 8   Mr. Dacus?

 9             MR. DACUS:  No, Your Honor, not evidentiary -- from

10   an evidentiary standpoint, no, Your Honor.

11             THE COURT:  I don't either.

12             MR. GILLAM:  Okay.

13             THE COURT:  All right.  Let's proceed on that basis.

14             MR. DACUS:  Is the Court going to seal the courtroom?

15             THE COURT:  If you'll ask.

16             (Bench conference concluded.)

17             MR. DACUS:  Your Honor, at this point, we're going

18   to -- Mr. Fitton is going to be testifying about some financial

19   information that has been designated in this case as

20   confidential, attorney's eyes only, and we would request that

21   the Court seal the courtroom.

22             THE COURT:  All right.  At the request of counsel,

23   I'm going to order the courtroom sealed.

24             Those of you present in the courtroom and not subject

25   to the existing protective order in this case should exit the
```

 1  courtroom and remain outside until the courtroom is unsealed.

 2  If you're not subject to the protective order in this case, you

 3  should excuse yourselves from the courtroom at this time.

 4          Since I don't see anybody getting up, I'll assume

 5  everybody I'm looking at is subject to the protective order.

 6  The Court finds that the courtroom has been sealed.

 7          (Courtroom sealed, in separate volume, Page 3, Line 3

 8          through Page 16, Line 25.)

 9          (Courtroom unsealed.)

10          THE COURT:  Now, it's approximately ten minutes after

11  6:00 p.m.  I'm not going to hold the jury any later today.

12  We're going to recess for the evening.

13          Mr. Gillam, you may continue your cross-examination

14  of Mr. Fitton tomorrow when we reconvene.

15          Ladies and gentlemen of the jury, I'm going to ask

16  you to leave your notebooks on the table in the jury room as

17  you leave for the day.

18          I want to remind you again that tonight when you get

19  home it's going to be a tempting time for somebody to ask you

20  what happened today.  Don't try to answer that question.  Don't

21  discuss or communicate about what's happened in regard to this

22  case and your service as jurors in any way, whatsoever.  That's

23  vitally important, and I remind you of it.

24          I also remind you to follow all my other

25  instructions.  I'm going to ask you to travel home safely.  And

```
 1   I'm going to ask you to be back in the morning assembled in the
 2   jury and ready to start again in the morning at 8:30.
 3              With those instructions, ladies and gentlemen, you're
 4   excused for the evening.
 5              COURT SECURITY OFFICER:  All rise for the jury.
 6              (Jury out.)
 7              THE COURT:  Mr. Fitton, you may step down.
 8              Counsel, be seated.
 9              Counsel for both parties, I am directing you to
10   advise each and every other witness you intend to call during
11   this trial that they are to limit their answers to the
12   questions that are asked, that they are to be responsive to the
13   questions asked, but they are not to exceed the scope of the
14   questions asked, and they are not to be nonresponsive.
15              And if I have the same kind of problems with
16   witnesses going forward that we've had today, principally with
17   Mr. Hays, I'm going to hold each of you and your clients
18   responsible.  I want no more of this way beyond the scope of
19   the questions that I tried to reign in today.
20              Also, I don't want any more sidebar comments in front
21   of the jury.
22              Mr. Scardino, you've been the worst offender of that.
23   You are not here to tell the jury the next topic that you
24   intend to go into with the witness.  You are here to ask the
25   witness questions and hear their responses and ask your
```

1    following questions.

2           But statements peppered amongst your examination

3    about, I'd now like to discuss this, or we'll next talk about

4    this, or anything of that nature are complete sidebar comments

5    directed not to the witness but to the jury intended to

6    communicate directly between counsel and the jury, and they're

7    not permissible.  And I don't want to hear those from anybody

8    going forward through the rest of this trial.

9           Now, there are still outstanding disputes between the

10   parties with regard to deposition clip designations that we've

11   only partially covered during an earlier recess today.  We're

12   going to recess for the day, but I want -- in about five

13   minutes, I want to see counsel in chambers, and we'll endeavor

14   to get through the rest of those so that we can start tomorrow

15   without those on the table.

16          Any other questions before we recess for the day?

17          MR. DACUS:  Not from Plaintiff, Your Honor.

18          MR. GILLAM:  No, Your Honor, not from the Defendant.

19          THE COURT:  I'll remind both parties that before I

20   bring the jury in, in the morning, I will request each side to

21   read into the record the items from the list of pre-admitted

22   exhibits used during today's portion of the trial.  Both sides

23   need to be prepared to do that by 8:30 in the morning.

24          All right.  With that understanding, we stand in

25   recess until tomorrow.

```
 1              COURT SECURITY OFFICER:  All rise.

 2              (Court adjourned.)

 3

 4              * * * * * * * * * * * * * * * * * * * * *

 5

 6                        CERTIFICATION

 7

 8         I HEREBY CERTIFY that the foregoing is a correct

 9    transcript from the stenographic notes of the proceedings in

10    the above-entitled matter to the best of my ability.

11

12

13    /s/Shelly Holmes_____          9/19/16
      SHELLY HOLMES, CSR, TCRR           Date
14    Official Court Reporter
      State of Texas No. 7804
15    Expiration Date:  12/31/16

16

17

18

19

20

21

22

23

24

25
```